1997 OK CR 78

**Jimmie Ray SLAUGHTER, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–94–1312.

Court of Criminal Appeals of Oklahoma.

Dec. 17, 1997.

Rehearing Denied Feb. 23, 1998.

844

J.W. Coyle III, Oklahoma City, Patrick A. Williams, Tulsa, for appellant at Trial.

Richard Wintory, Wes Lane, Assistant District Attorneys, Oklahoma City, for appellee at Trial.

J.W. Coyle III, Gloyd L. McCoy, Oklahoma City, for appellant.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for appellee.

LUMPKIN, Judge.

¶ 1 Appellant Jimmie Ray Slaughter was tried by a jury in the District Court of Oklahoma County, Case No. CF–92–82, and convicted of two counts of Murder in the First Degree (21 O.S.1991, § 701.7(A)).[1] Trial commenced on May 16, 1994 and continued until October 7, 1994, when the jury returned its verdict on punishment.[2] The prosecution sought the death penalty, alleging in each count that (1) the murder was especially heinous, atrocious, or cruel (21 O.S.1991, § 701.12(4)); (2) there existed a probability the defendant would commit criminal acts of

violence that would constitute a continuing threat to society (21 O.S.1991, § 701.12(7)); and (3) the defendant knowingly created a great risk of death to more than one person (21 O.S.1991, § 701.12(2)). Before the jury began second-stage deliberations, the prosecution dismissed the allegation that the murder charged in Count I was especially heinous, atrocious. As to Count 1, the jury found only that Appellant knowingly created a great risk of death to more than one person; it did not find that Appellant would be a continuing threat to society. As to Count 2, the jury found that the murder was especially heinous, atrocious, or cruel and that Appellant knowingly created a great risk of death to more than one person; the jury did not find continuing threat. The trial court followed the jury's recommendations and sentenced Appellant to death on each count. We affirm.[3]

¶ 2 At "right around noon" on July 2, 1991, Ginger Neal noticed that her pitbull dog, Ozie, was barking and acting strangely in the back yard. Ozie was somewhat skittish, more so around adults than with children. The dog was in such a hurry to get into the house that he practically ran over a child on his way to his place of refuge in the house. Ms. Neal was sufficiently concerned to glance out in the back yard to see if an intruder were present; she saw nothing. A few minutes later, she heard a noise, as if a car were backfiring or a firecracker had exploded. As Independence Day was only two days away, she thought nothing of the noise. Rhonda Moss, who lived in the same house as Ms. Neal, also heard the noise. At least one other neighbor also heard the backfiring noise. Neither Ms. Moss nor Ms. Neal

1. Appellant was also convicted of **Count 3**, Perjury (21 O.S.1991, § 491) (two years); **Count 4**, Perjury (21 O.S.1991, § 491) (four years); **Count 5**, Perjury (21 O.S.1991, § 491) (five years); **Count 6**, Perjury (21 O.S.1991, § 491) (three years); **Count 7**, Perjury (21 O.S.1991, § 491) (one year). The jury found Appellant **not guilty** on an eighth count of perjury. It appears Appellant does not contest these judgments and sentences on appeal.

2. I agree with my colleagues this is a long opinion. However, it reviews an exceptionally long trial. The parties have a right to know this Court has thoroughly reviewed the voluminous record

presented on appeal, adjudicated the propositions of error based on the totality of the record, and is enunciating a clear decision on each of those issues supported by the law and facts. Through this process, we ensure confidence that our decisions are based on the rule of law and are not merely result oriented.

3. Appellant's Petition in Error was filed in this Court on June 9, 1995. Appellant's brief was filed July 1, 1996, and the State's brief was filed October 29, 1996. The case was submitted to the Court October 30, 1996. Oral argument was held August 12, 1997.

thought much about it until the bodies of Melody Wuertz and her 11–month–old daughter, Jessica, were found early that same evening in the house next door.

¶ 3  Melody was found on the floor in her bedroom.  She had been shot once in the cervical spine and once in the head.  In addition, she had been stabbed in the chest and in her genitalia; and there were carvings on her abdomen and breasts which authorities interpreted as symbols of some kind.  A comb filled with Negroid hairs, some underwear containing Negroid head hairs, some unused condoms and some gloves were found near Melody's body.  No seminal fluid was found in or on Melody.  In the bathroom, Melody's curling iron was still plugged in.  Baby Jessica was found in the hallway; just days shy of her first birthday, she had been shot twice in the head.  The medical examiners who examined the bodies estimated time of death to be approximately between 9:30 a.m. and 12:15 p.m. on July 2.

¶ 4  The prosecution's theory was that Melody was surprised while in the bathroom as she was preparing for work (the evening shift at the Oklahoma City Veterans Administration Hospital); was then paralyzed (but not rendered unconscious) by the shot to the cervical spine; was forced to lie paralyzed and conscious as her child was killed; then was dragged to the bedroom, where she was killed by the shot to her head.  The killer then planted the evidence in an attempt to throw investigators off the trail.

¶ 5  Appellant (a nurse at the VA Hospital) was a suspect from the very beginning. He and Melody had had a sexual relationship, the result of which Melody became pregnant.  Appellant signed an affidavit acknowledging paternity on July 17, 1990, ten days after Jessica was born.  Despite this acknowledgment, Appellant's support of the child was meager, a fact Melody mentioned more than once.  Melody's insistence on getting Appellant to provide monetary support for her child irritated him.  He once remarked to a co-worker at the hospital that Melody was getting "pushy," and if she continued to act that way, he would have to kill her.  To another, he said Melody was causing him problems at work, and one day he would have to kill both Melody and Jessica. Appellant was concerned a paternity action by Melody could jeopardize his status as a reserve officer in the Army; additionally, Appellant was married, and his wife did not know about the affairs with Melody and other women.  In the fall of 1990, Appellant was called to active duty during the Desert Storm military operation, and was stationed at Ft. Riley, Kansas.  He remained on active duty there until mid-July, 1991.  During this period, what scant payments Appellant had made to Melody stopped.  This forced Melody to seek child support through the Department of Human Services, an action which enraged Appellant.  Before her death, Melody expressed to several people her fear that Appellant would take action against her because she had initiated child support proceedings against him.

¶ 6  Appellant presented an alibi defense. He presented evidence purporting to show he was with his family shopping in Topeka, Kansas, at the time of the murders.  Other facts will be presented as they become relevant.

## I.

### PRE–TRIAL ISSUES

#### A.

¶ 7  In his second proposition of error, Appellant claims the trial court committed reversible error by not allowing defense counsel to question prospective jurors about their attitudes toward the death penalty in relation to other sentences.  Appellant acknowledges this Court has refused to allow evidence on the cost-effectiveness of the death penalty during the sentencing stage of a capital case.  *See Smallwood v. State,* 907 P.2d 217, 233 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996).  However, he claims the issue here is not that *evidence* be allowed, but that he should be able to question jurors about their *perspectives* of the death penalty in terms of cost factors, i.e., that jurors' concerns about the cost of incarceration for life would prompt them to be inclined to support a decision to sentence Appellant to death.

¶ 8 Appellant is correct in his assertion that he presented a motion in limine concerning the issue. He is also correct that the trial court denied the motion. Beyond that, the record does not support his contentions. Indeed, we have found at least two instances where defense counsel asked the question during *voir dire;* and on neither occasion was an objection raised by prosecutors. In short, Appellant was allowed to ask his questions.[4] This renders Appellant's complaint moot.

### B.

■ ¶ 9 In his third proposition of error, Appellant alleges the trial court denied him his right to a public trial when portions of *voir dire* were closed to the public. Again, the record shows the proposition is without merit. After conducting *voir dire* with all jurors present, the court agreed to individual questioning of the jurors on the issues of capital punishment, the occult and pretrial publicity. Rather than conduct the individual *voir dire* in the judge's small chambers, the decision was made to have it in the courtroom but to exclude spectators. At that point, the court noticed Melody's parents were in the courtroom, and questioned whether they should be allowed to remain. The prosecutor, Mr. Wintory, expressed his belief the purpose of individual *voir dire* was to prevent accidental contamination of other jurors, and he had no objection if the parents were allowed to remain. At that point, defense counsel said "I agree with Mr. Wintory, it needs to be public." However, during individual *voir dire,* the court ordered the parents to leave the courtroom. Defense counsel objected to the fact the prosecutor conferred with the parents privately over the issue, claimed this gave them special status, and moved for a mistrial. After further discussion, it was decided to exclude everyone except the individual jurors. The following exchange then occurred:

Mr. Wintory: Finally, your honor, let me say this. I renew my request that the defense—and this Court question Mr. Slaughter specifically on his waiver of his right to have a public and open courtroom, and that he has since [sic] to the procedure that has been outlined.

Court: You mean as far as the interrogation of members of the panel in camera on these three questions?

Mr. Wintory: Yes, Your Honor.

Court: Is that is that [sic] agreeable, Mr. Coyle?

Mr. Coyle [defense counsel]: Yes, sir.

Mr. Williams: I would advise the Court, as an officer of your court, I have conferred with our client and advised him of the matter that Mr. Wintory addresses, and was—would tell you at this time, that Mr. Slaughter has been apprised of the fact of the nature and what this in camera proceeding is. The purpose of it is to safeguard tainting any of the other prospective jurors with any remarks from the juror who is under interrogation. That it would be done in private, that it is an in camera proceeding, albeit in your courtroom, and I have explained that to him and he is perfectly willing for us to proceed in that fashion. Is that correct, Mr. Slaughter?

Mr. Slaughter: That is correct.

Court: Is that good enough?

Mr. Wintory: Word of counsel is good enough for me.

Court: That is fine. And for the Court too.

---

4. At one point, defense counsel Patrick Williams asked potential juror Baldwin the following question: "Some people seem to view capital punishment and life in the penitentiary on economic terms in the sense that they would favor executing somebody so they wouldn't have to spend money keeping them in prison for life. What I need to know is, would you ever equate somebody's living or dying on a dollar value?" The juror told him that would not be a factor. No objection was raised, and the question was allowed to stand. (5–19–94 Tr. 46). On another occasion, Mr. Williams asked the following questions: "Are you concerned at all about the amount of money that would be expended by the State if someone were committed to the penitentiary for the rest of their natural life and was not going to be paroled? Does the economic factor weigh on you?" When the juror replied that would not be a factor, Mr. Williams stated: "Thank you. You're not going to put a dollar sign on somebody's life?" The juror gave a negative response. Again, no objection was lodged, and the question was allowed to stand. (5–24–94 Tr. 30).

(5–18–94 Tr. 140–41). Without deciding whether proceedings in a locked courtroom can be the equivalent of an *in camera* hearing, we find this to be a sufficient waiver of the right to have the proceedings conducted in open court. This proposition is without merit.

## C.

¶ 10 In his fourth proposition, Appellant claims the prosecution failed to provide defense counsel with important exculpatory evidence which would have shown the murders could have occurred earlier than theorized by the prosecution. In support of this contention, Appellant filed a motion to supplement the record pursuant to Rule 3.11, 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals,* on June 13, 1996. That motion was denied by this Court on July 3, 1996, because it did not meet the requirements of Rule 3.11. Appellant has provided no other evidence to support this allegation. Consequently, we find it to be without merit. *See* Rules 3.5(A)(5) & (C)(1), 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals.*[5]

## D.

¶ 11 In his fourteenth proposition of error, Appellant argues the court erred in not quashing the bill of particulars. He bases this on *Hunter v. State,* 829 P.2d 64 (Okl.Cr. 1992), where this Court held that a bill of particulars must be filed before or at the time of district court arraignment.

¶ 12 Language in *Hunter* itself renders this proposition without merit. There, after noting when the bill of particulars must be filed, we added that the trial court for good cause shown can extend that time. This ability is at the trial court's discretion. *Id.* at 65.

¶ 13 The difference between this case and *Hunter* is vast. In *Hunter,* the prosecution did not file the bill of particulars until seven days before trial, a time frame which this Court deemed "clearly unreasonable." *Id.* In contrast, Appellant was arraigned on February 5, 1993. At a hearing on August 26, 1993, the prosecution announced it had not filed a bill of particulars, but added "we would advise the Court and counsel, *we've spoken before,* that we do intend to seek the death penalty in this matter." (8–26–93 Tr. 3) (emphasis added). The bill of particulars was filed on November 15, 1993. Jury selection for trial began on May 16, 1994. Therefore, Appellant had six months' official notice that the prosecution would seek the death penalty.

¶ 14 This is unquestionably a voluminous record. However, from the above dates, it seems evident Appellant knew well in advance of trial that the prosecution intended to seek the death penalty in his case, and would file a bill of particulars. Under the circumstances of this case, we find six months before trial constitutes a "reasonable time," *Marquez v. State,* 890 P.2d 980, 982 (Okl.Cr.1995), to file a bill of particulars and give Appellant notice of what the State would use to seek the death penalty. Under the circumstances, the trial court did not abuse his discretion in allowing such a filing. *See also Carpenter v. State,* 929 P.2d 988, 994–95 (Okl.Cr.1996) (bill of particulars filed three months after arraignment and one month before trial reasonable); *McCracken v. State,* 887 P.2d 323, 331 (Okl.Cr.1994), *cert. denied,* 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995) (bill of particulars and amended bill of particulars filed six and four months before trial deemed reasonable). This proposition is without merit.

## II.

### *FIRST–STAGE TRIAL ISSUES*

### A.

¶ 15 In his sixth proposition of error, Appellant complains he was denied his right to

---

**5.** Additionally, it appears trial counsel knew the information. During the preliminary hearing, counsel asked OSBI Agent Lonnie Rickey to retrace his steps during the investigation. Rickey testified he talked to Dill about the autopsy report showing "where Jessica had a small amount of food in her stomach, and we went to Wuertz's house to try to find the source of that food." Defense counsel asked the date this happened, then asked "[w]as that the peas and carrots—or carrots and something?" to which Rickey replied it was. He testified he found nothing at the house, prompting defense counsel to say "[w]e'll never know where those peas and carrots and other things came from," to which Rickey replied they had discovered the baby-sitter had fed the child that the evening before. (12–14 PH Tr. 71–73).

a fair trial because of improper admission of evidence dealing with the occult and satanism. He claims the evidence was not relevant to whether he killed Melody and Jessica Wuertz; but even if it were, its prejudicial value exceeded any probative value it might have had.

¶ 16 Appellant cites *Sellers v. State*, 809 P.2d 676 (Okl.Cr.1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991) in support of his contention evidence of the occult is not relevant. We disagree with Appellant's characterization of the case. This Court did not say evidence of the occult would always be irrelevant; we deemed the evidence irrelevant in that particular case. There, Appellant sought to introduce testimony that an Oklahoma City girl who had no connection to his case had become involved in satanism, and the girl had also received a note signed by someone else (also not involved in the case) who was believed to be involved in satanism. The note informed the girl that she would kill her parents and that she would be kidnapped. The girl was placed in a mental institution to undergo therapy in connection with these occult influences. Appellant claimed it was error to exclude this evidence, as it would have been relevant to show the presence and influence of satanism in Oklahoma City. *Id.* at 683. We disagreed. Whether satanism or other occult influences were present, or even widespread, in Oklahoma City, is not relevant absent some evidence showing more than a tenuous connection between the defendant and the issue. In the *Sellers* case, there was no admissible evidence connecting that defendant with the occult. *Id.* Consequently, the issue was not properly a part of that case.

¶ 17 Here, the evidence is relevant. Unlike *Sellers*, where there was no admissible evidence to indicate the murders themselves were ritualistic slayings, here there were carvings on the body of Melody Wuertz which pointed to the possibility of an occult-related slaying. Several items at the scene were planted by Appellant to lead authorities away from himself as a suspect.

¶ 18 It is true that one could make an argument it would be inconsistent to plant evidence to mislead authorities while at the same time leaving evidence which could point to Appellant. Whether the evidence pointed to Appellant or away from him is not important. In either case, the evidence is relevant, as it would "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action"—here, who murdered Melody and Jessica Wuertz— "more probable or less probable than it would be without the evidence." 12 O.S. 1991, § 2401. That Appellant had knowledge of the occult would be relevant to show that he could have carved such symbols into the flesh of Melody Wuertz. The State was required to present evidence that created a mosaic which ultimately would identify Appellant as the perpetrator of these offenses. Appellant's knowledge and affinity toward the occult was one of many pieces of the puzzle which established the identity of a complex individual. *See Commonwealth v. Drew*, 397 Mass. 65, 489 N.E.2d 1233, 1242–43 (1986) (evidence of satanism could help explain to the jury acts of violence which would otherwise appear to be inexplicable); *Commonwealth v. Costal*, 351 Pa.Super. 200, 505 A.2d 337, 338 (1986) (Court deems defendant's beliefs "highly probative regarding the manner of the slayings"; therefore evidence of satanism not improper).

¶ 19 Appellant also claims that the court erred in allowing testimony from FBI Agent Kenneth Lanning on the occult. He contends Lanning was not an "expert" in the field, and therefore was not qualified to testify as one. As a preliminary matter, this Court has long held that the qualification of a person to testify as an expert is a matter which rests with the sound discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of that discretion. *Taylor v. State*, 889 P.2d 319, 338 n. 85 (Okl.Cr.1995); *Clayton v. State*, 840 P.2d 18, 28 (Okl.Cr.1992), *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993). This Court has defined "abuse of discretion" as "clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application." *R.J.D. v. State*, 799 P.2d 1122, 1125 (Okl.Cr.

1990) (quoting *Stevens v. State,* 94 Okl.Cr. 216, 225, 232 P.2d 949, 959 (1951)). We shall therefore examine the evidence which led the trial court to qualify Lanning as an expert.

¶ 20  Lanning testified he was a supervisory special agent in the Behavioral Sciences and Services Unit at the FBI Academy in Quantico, Virginia. His job consisted of applying his knowledge of the behavioral sciences to the criminal justice system; specifically in the areas of training, research and case consultation.

¶ 21  Appellant's contention at trial was that, as Lanning's primary expertise was focused on the sexual victimization of children and since there was no such allegation present in this trial, Lanning was outside his area of expertise. To take such a restricted view is to ignore past caselaw from this Court dealing with expert witnesses. Section 2702 of the Evidence Code requires that the expert who testifies must be qualified "by knowledge, skill, experience, training or education." Although the Evidence Code is not cited, this idea is well described in *Perry v. State,* 561 P.2d 112 (Okl.Cr.1977). There, the issue was whether a defendant was driving while under the influence of an intoxicating beverage. The prosecution's witness was qualified under Oklahoma statutes, which required a special permit from the Board of Chemical Tests for Alcohol Influence before testing could be conducted for that purpose. The defendant's expert did not possess the permit, and the trial court refused to let the defense witness testify based on that lack of a permit. This Court reversed, noting that while possession of such a permit would be good evidence of a witness' qualifications, its absence is no real indication that the witness is not qualified to perform the test.

A physician, chemist, medical technologist, biologist, biochemist, toxicologist or a person with similar training or experience is ordinarily qualified as an expert in conducting scientific tests to determine the alcoholic content of blood and in interpreting the results of such tests. See, III Wharton's Criminal Evidence § 591. Under the trial court's application of the statute, the chemist for the DuPont Company who developed and perfected the latest method approved by the Board, would not be permitted to testify as an expert. Rather, the test he had run would not be considered valid evidence because he did not possess the required permit.

*Id.* at 114. The gist of the opinion is clear. As one evidence authority has stated: "Labels can be misleading and might otherwise deprive a party of expertise which is needed to develop the issues in the case." 2 L. Whinery, *Oklahoma Evidence: Commentary on the Law of Evidence* at 561. *See also Jenkins v. United States,* 307 F.2d 637, 643–44 (D.C.Cir.1962) (psychologist's ability to render an opinion on a medical issue in the case depended on the nature and extent of his knowledge, not on his title). Here is a good example. Although Lanning's acknowledged field of expertise lay in the field of sexual victimization of children, he also testified that, in the course of that study, he had developed a specialized knowledge and expertise in the field of occult systems as they manifested themselves in the commission of crimes which he was studying. As he investigated the field of the occult, he quickly discovered most allegations of child abuse in this area were done in broader context of occult behavior. Consequently, he began thoroughly familiarizing himself in the area of the occult to better and more thoroughly complete his job in his specialized area. He did this by attending seminars and doing extensive reading on the subject as well as speaking with experts in the field for information which could be applied in his investigative process. *See Yates v. Garrett,* 19 Okl. 449, 92 P. 142, 143 (1907) (although they may not be experts in the sense that they had extensive and exhaustive knowledge of the subject, witnesses who had acquired some knowledge of the subject based on their experiences were properly qualified to testify). In light of this background, we do not find the trial court's ruling to be clearly erroneous.

¶ 22  Appellant also complains of other instances in which the trial court admitted evidence of the occult. The rationale for admitting the testimony of Lanning applies here as well: the evidence shows both that Appellant had the knowledge to leave certain

kinds of evidence at the scene which could either mislead investigators or give them clues as to the killer's identity. The evidence could also tend to show Appellant's belief system and how that belief system could allow him to commit the murders.

¶ 23 Nor do we find the evidence substantially more prejudicial than probative. Although it is most likely true that the evidence did not "endear[ ] Appellant to the average juror," *Costal,* 505 A.2d at 338, evidence was also introduced which tended to show Appellant was not involved in the occult, and that he was just a braggart trying to impress those around him. Additionally, the trial court instructed the jury that it was free to give the expert evidence dealing with the occult whatever weight and credit it deemed proper. *Id.* at 338–39.

¶ 24 For all these reasons, this proposition is without merit.

### B.

¶ 25 In his seventh proposition of error, Appellant complains that evidence of "bad acts" which he had allegedly committed deprived him of a fair trial. He asserted the evidence, much of it from acts or statements committed years earlier, portrayed him as a "murderous devil worshiper." Specifically, the evidence showed that he enjoyed killing in Vietnam; that he did not know what the "big deal" was about a baby being killed, when thousands died in Vietnam; that while watching television with a co-worker, Appellant said of a character on television that he could "mutilate a sleazeball like that and he wouldn't be recognized"; that he referred to an uncooperative patient as "the type of sleazeball I could mutilate." None of these errors was preserved for appeal, as defense counsel either failed to object, or objected on different grounds than those asserted on appeal.[6] Consequently, we review only for plain, reversible error. *Simpson v. State,* 876 P.2d 690, 693 (Okl.Cr.1994). When no

objection was lodged at trial, this Court shall consider the error as harmless "unless it ha[s] a 'substantial influence' on the outcome, or leaves the reviewing court in 'grave doubt' as to whether it had such an effect." *Id.* at 702.

¶ 26 The comments of which Appellant now complains do not rise to that standard— if indeed they were error at all. Melody's body was mutilated by the carvings in her flesh; therefore, the comments concerning mutilations are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice. 12 O.S.1991, § 2403. The same is true concerning his statements that he enjoyed killing in Vietnam, and failing to see what the "big deal" was concerning a baby's death: these statements show a state of mind, and illustrate how a person might be capable of murdering a small child.

¶ 27 Another witness testified that Appellant once told him he had been in a special forces unit that would go into villages in Vietnam, seek out individuals identified as Vietcong sympathizers, and kill them. Appellant said when he cut the throats of his victims, it gave him an "erection." Again, no objection was lodged. Again, we find no plain, reversible error. This, too is relevant, as a knife was used in an unusual way on Melody.

¶ 28 Appellant next contends a witness improperly testified that Appellant supposedly killed some other people. This is incorrect. The witness told the jury Appellant "told me about two instances of criminal background which—" At that point, defense counsel objected. As a result, the jury heard nothing about the fact Appellant may have killed others, as this was discussed only in the bench conference. Additionally, the jury was admonished to disregard what little testimony on the subject which it heard. This cured the error. *Charm v. State,* 924 P.2d 754, 770 (Okl.Cr.1996), *cert. denied,* —— U.S.

---

6. The State in its brief asserts these and other statements by Appellant are not covered by 12 O.S.1991, § 2404(B) as they are not "acts" as contemplated by that statute. This narrow view of the statute is incorrect. *Freeman v. State,* 767 P.2d 1354, 1355 (Okl.Cr.1988) (Act may not be a

crime but still carry "a certain stigma that could influence a jury." An act not related to the crime charged need not constitute a violation of the criminal law for it to be governed by § 2404(B).).

——, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997); *Ezell v. State*, 909 P.2d 68, 70 n. 1 (Okl.Cr. 1995); *Richie v. State*, 908 P.2d 268, 278 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 111, 136 L.Ed.2d 64 (1996).

¶ 29 Appellant also contends it was error to allow testimony about his bias towards African Americans. Defense counsel did not object to this testimony, so it will be reviewed for plain, reversible error. *Simpson*, 876 P.2d at 693. We find no such error. The testimony was relevant to show why Appellant would have planted evidence at the scene indicating an African American committed the murders, and why Appellant was the first person to mention to authorities during his interview that it was possible an African American had killed the victims. Additionally, despite the testimony that Appellant did not like African Americans, the same witness testified that Appellant worked with an African American while at Fort Riley, and described her as "a nice girl, and he liked her." This testimony tends to discount the assertion that Appellant bore a universal hostility towards all African Americans.

¶ 30 Accordingly, this proposition is without merit.

### C.

¶ 31 In his eighth proposition of error, Appellant argues that excited utterance testimony of Cecilia Johnson should not have been admitted into evidence. To understand this proposition, it is necessary to recount more facts produced at trial.

¶ 32 Cecilia Johnson was a nurse who worked with Appellant at the VA Hospital in Oklahoma City. At the same time Appellant was having sexual relations with Melody, Johnson was undergoing a divorce, and her self-esteem was very low. After Melody became pregnant, Appellant started having sexual relations with Johnson. The prosecution's theory—which was borne out by evidence at trial—was that Appellant had the ability to recognize women who were vulnerable and to exploit that vulnerability to his own ends. When it came to Johnson, Appellant's mastery was complete. She openly expressed to co-workers her hostility to Melody when Melody sought money from Appellant to support her child. The prosecution produced evidence showing that Johnson began helping Appellant prepare for the murders. She did this by keeping him abreast of what Melody did and said while he was stationed at Ft. Riley, by obtaining Negroid hairs and clothing from a patient at the hospital and mailing those items to Appellant so he could plant them at the murder scene.

¶ 33 As the investigation into the murders progressed, Johnson and prosecutors reached an agreement. One of the terms of this agreement was that Johnson would be immune from prosecution for assisting Appellant if she agreed to cooperate with authorities in their investigation. In addition to providing authorities with information concerning her participation, Johnson also recorded a telephone conversation she had with Appellant, and wore a recording device to a meeting she had with him. After an earlier failed attempt, Johnson committed suicide in February 1992.

¶ 34 On January 11, 1992 (a Saturday), Johnson received a call at work from a friend, who told her there was an article on the Slaughter case in the early edition of the Sunday newspaper, and Johnson's name was in it. When Johnson obtained a copy of the newspaper and read the article, she became very agitated, waving her arms around and saying "[h]ow could they do, how could this happen." Johnson then telephoned someone and, while on the telephone, yelled: "[h]ow could this happen, you were supposed to protect me." She repeated the remarks to the witness when she ended the telephone conversation, adding that "[t]hey used my words, they didn't have to be so explicit, they could have been more vague. How could they have let this happen." She then said: "I'm a goner, he's going to kill me. I'm going to get killed." When the witness pointed out that Appellant was in jail, Johnson looked at her as if she were completely ignorant, and told her Appellant knew people who could have her killed, and he would have an alibi since he was in jail. Johnson then related how she had gone into a black patient's room, got hair off a brush, got a pair of underwear the patient had left behind, and

sent the items to Appellant so he could plant them at the scene to mislead authorities. At trial, defense counsel did not disagree that the first statements could be classified as excited utterances and therefore admissible even though hearsay. 12 O.S.1991, § 2803(2). He contended, however, that the latter statements were not admissible, as Johnson was no longer under the stress of excitement caused by seeing the newspaper article and was merely trying to assign blame for the murders on Appellant.

¶ 35 The excited utterance exception to the rule against hearsay is admissible in court and does not run afoul of the Confrontation Clause of the Sixth Amendment because such statements are made in contexts that provide "substantial guarantees of their trustworthiness." *White v. Illinois,* 502 U.S. 346, 355, 112 S.Ct. 736, 742, 116 L.Ed.2d 848 (1992). As the Supreme Court has pointed out, this "firmly rooted" exception is nearly two centuries old. It is recognized in four-fifths of the states as well as the federal rules of evidence. *Id.* at 355 n. 8, 112 S.Ct. at 742 n. 8. However, to qualify under this exception, certain requirements must be met.

¶ 36 This Court has observed there are three foundational requirements which must be satisfied before hearsay evidence can be admitted into evidence under the excited utterance exception. There (1) must be a startling event or condition; (2) there must be a statement relating to that startling event or condition; and (3) that statement must be made while the declarant is under the stress of excitement caused by the startling event or condition. *Marquez,* 890 P.2d at 983 (citing *McCalip v. State,* 778 P.2d 488, 490 (Okl. Cr.1989)). In determining whether statements fall under this exception, we examine both the timing of the statement and its spontaneity. As this is determined by the facts of each case, we conduct the analysis on a case-by-case basis. *Id.*

¶ 37 There appears to be no argument that a startling event existed. Reading a newspaper article in which she was named as cooperating with authorities—a fact Johnson evidently did not want Appellant to know—clearly upset her. Nor is there any dispute that a statement was made which relates to the startling event. The only issue is whether the statements were made while Johnson was under the stress of excitement caused by the condition.

¶ 38 The witness testified that Johnson became agitated while reading the article and appeared to be in a state of excitement during the entire conversation. She either was agitated, shaky or irritable the entire time. She spoke with a trembling voice. She exhibited signs of either anger, fright or terror the entire time she made the statements at issue. It appears Johnson made a few statements before she made a telephone call; uttered other statements during the course of a telephone call of undetermined length; then made the remainder of the statements immediately after completing the telephone call. We do not believe an extended period of time elapsed between the time Johnson first viewed the article and completed the statements at issue. Further, it appears that all of Johnson's statements at issue were made while she was under the stress of excitement caused by the event. As all conditions were met to admit the statement, the court did not err in allowing the complained-of testimony. This proposition is without merit.

### D.

¶ 39 Appellant next complains the court erred in allowing what he characterizes as an opinion by the medical examiner that Johnson was being truthful. Again, further examination of the facts is necessary.

¶ 40 As noted above, Johnson expressed hostility towards Melody because she perceived Melody was creating problems for Appellant. In fact, Johnson once told a co-worker that she would kill someone for Appellant. Taken in context, the co-worker suspected the "someone" mentioned was Melody. One defense theory at trial was that it was Johnson, not Appellant, who committed the murders.

¶ 41 Despite this hostility towards Melody, Johnson adored Jessica because she was Appellant's child. She was always anxious to obtain pictures of the baby, and at one point

even expressed her desire to have Jessica as her very own.

¶ 42 When Johnson learned that both Melody and Jessica had been murdered, she had a noteworthy reaction. One witness said she immediately turned pale and white, as if the blood had drained out of her face. Another witness testified she appeared "shocked" and grabbed a nearby pole, as if she were fainting. To relate the significance of this reaction, the prosecution called Dr. Fred Jordan, the Oklahoma Medical Examiner, to testify about the autonomic nervous system. The prosecution's theory was that Johnson's response could not be contrived, and was therefore genuine; the implication was that Johnson either did not know the deaths were pending, or did not know that Jessica was also going to die. In either case, it would tend to refute the defense theory she had committed the murders. At trial, defense counsel objected on the basis that the medical examiner was not qualified to give an expert opinion on autonomic responses. The trial court overruled the objections, admitting the testimony. Appellant claims that was error.

¶ 43 As we noted above, the trial court has wide latitude in deciding whether to allow a person to testify as an expert and that decision will not be disturbed on appeal absent an abuse of that discretion. *Clayton*, 840 P.2d at 28. The mere fact that Dr. Jordan was the state medical examiner does not detract from the fact he also completed medical school, was a medical doctor and was licensed to practice medicine in the State of Oklahoma. His job required him to be familiar with every aspect of anatomy, so he could differentiate between what was normal and what was not. In addition, Dr. Jordan also testified that before coming to court, he reviewed literature in the field of autonomic responses. In light of his other qualifications, we hold the doctor was qualified as an expert, not only by education and knowledge, but also by educating himself further in the particular subject at issue. *See Perry*, 561 P.2d at 114.

¶ 44 Further, we disagree with Appellant's characterization of Dr. Jordan's testimony as vouching for Johnson's truthfulness. The doctor simply testified that a human face cannot be made pale voluntarily; that such a condition is generally due to a fall in blood pressure, which is an involuntary response. He further testified he knew of no way an individual on his own for whatever reason could deliberately instantaneously make the face pale. He also testified that there were some drugs which could affect the autonomic nervous system, that he did not review Johnson's medical history, and that he did not know if she were taking any such drugs. None of this expresses an opinion that Johnson's response to the news of the deaths was genuine and not contrived; it merely gave reasons how such responses could occur, and how they could not occur. *Cf. Davenport v. State*, 806 P.2d 655, 660 (Okl.Cr.1991) (expert testimony on child accommodation syndrome is admissible evidence if, among other requirements, the expert testifies about general acceptance of syndrome in the scientific community and the expert's knowledge of syndrome; and if the expert testifies about the background and nature of syndrome, rather than stating an opinion as to whether or not a particular child suffered from the syndrome).

¶ 45 Despite the assertions of Appellant, the evidence was relevant. Defense counsel tried to paint Johnson as the murderer. Without giving an opinion, the doctor testified as to the control a person could exert over the autonomic nervous system, and factors which could affect that system. Had Johnson been the murderer, or known that Jessica was going to be killed, she would not have been surprised. The jury could use the information provided by Dr. Jordan to assist them in determining whether Johnson feigned surprise when learning of the deaths. From this, the jury could draw its own conclusions concerning whether Johnson committed the murders or knew they were going to happen.

¶ 46 Appellant's ninth proposition of error is without merit.

E.

¶ 47 In his tenth proposition of error, Appellant contends the court erred in allow-

ing the state to present irrelevant evidence concerning debts of Nicki Bonner. As noted above, Bonner was Appellant's wife at the time of the murders. She testified that Appellant was with them in the Ft. Riley–Topeka area the entire day when Melody and Jessica were killed in Edmond. During cross-examination, Bonner admitted that at the time of the murders, she had a credit card debt which totaled approximately $25,000.

¶ 48 Appellant claims this evidence was irrelevant. The State argues the evidence was relevant, but does not tell this Court what that relevance is. We fail to see the relevance. The effect of this error will be discussed in connection with Appellant's first proposition, below.

### F.

¶ 49 Appellant next complains the State was improperly allowed to present irrelevant and prejudicial testimony from Appellant's paternity attorney concerning her attitude about Appellant and his state of mind. At trial, the prosecution called Cathy Christensen as a witness. Christensen, an attorney specializing in family law, had been contacted by and counseled Appellant after Melody filed the paternity action with the state Department of Human Services.[7] Christensen met with Appellant late in the afternoon at her Oklahoma City office. She testified that Appellant was angered by Melody's filing of the paternity action and the State's becoming involved. While in her office, he paced back and forth and occasionally punched one hand into the palm of another. As they discussed the paternity action, Appellant became so angry Christensen did not want to be alone with him, and asked another attorney in the building to remain.

¶ 50 We find no error. The State's theory was that Appellant killed Melody and Jessica to keep from having to support the child in a manner which he could not control. Christensen pointed out to him that, since Melody had filed her action through the state Department of Human Services, Appellant would have to obey any orders a court of law might impose on him concerning Jessica; and that if he did not pay, he would answer to the State, not Melody. She also told him Melody would be under no obligation to file an accounting of how she spent the money Appellant would be forced to give her. Additionally, she pointed out that Jessica could inherit part of his estate after his death, thus interfering with the amount his other daughters would receive. Appellant's anger was a result of this information. Evidence concerning the amount of anger Appellant had was relevant, as it tended to illustrate any motive Appellant would have for killing the child in addition to Melody. 12 O.S.1991, § 2401; *Mayes v. State*, 887 P.2d 1288, 1312 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995) ("Our statutes allow into evidence anything 'having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' ") (emphasis in original).

¶ 51 Accordingly, Appellant's eleventh proposition of error is without merit.

### G.

¶ 52 For his twelfth proposition of error, Appellant alleges the admission of testimony from John Call and Robert Hazelwood deprived him of a fair trial. He contends neither witness had testified in the subject area in which they testified at Appellant's trial, and there was nothing establishing the acceptability of their theories in the scientific world. We shall examine the testimony of both men, but first must address a question of waiver.

¶ 53 In his brief, Appellant initially seems to advance a question of acceptability of the witnesses' theories in the scientific community. However, after initially advancing the argument, he fails to further discuss it. He also fails to support his argument with relevant citation of authority. Consequently, he has waived this portion of his argument for review by this Court. Rule 3.5(A)(5), 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals*. We therefore

---

7. Appellant had previously waived his attorney-client privilege with Christensen.

limit our review only to the first portion of his argument, that neither witness had testified in the subject area in which he testified at Appellant's trial. We begin with Hazelwood.

¶ 54 Hazelwood testified he was a member of the Academy Group, an organization of former FBI agents specializing in behavioral sciences who joined together to act as a consulting and research group. Most of his work had been in the field of sexual sadism; however, in his studies of this field, he became intrigued with the type of woman who would allow herself to be ensnared into such a situation. At Appellant's trial, Hazelwood's testimony dealt not with sexual sadism, but rather with the common characteristics of the so-called "compliant" women. Defense counsel objected based on the fact Hazelwood was not qualified as an expert in this field. Defense counsel also claimed the testimony would be nothing more than profile evidence. He did not raise the objection that there was no scientific basis for the testimony. We therefore need not address that issue on appeal.

¶ 55 The same rationale that we used to find no fault with Agent Lanning's testimony, *see* Section II.B., above, is applicable here. Although the compliant woman syndrome is not his specialized area of expertise, he familiarized himself with the topic during the course of his regular research because he saw it as a recurring pattern within his specialized area. Based on his observations, he published an article outlining these characteristics. This publication led to a presentation of his findings to a group of professionals in Australia and publication in an Australian medical journal. In addition, he has both solicited information from and provided information to professional groups at Johns Hopkins University School of Medicine, Georgetown University psychology department, the Kirby Psychiatric Diagnostic Center in New York City, Old Dominion Psychiatric Hospital, International Conference on Sexual Violence in Melbourne, Australia, the Washington, D.C., Psychological Association, the University of Virginia School of Nursing, the Pines Treatment Center for Juvenile Sex Offenders in Ft. Smith,

Va., the American University School of Psychology, Nova University School of Psychology, and the George Washington University School of Psychology. He has also provided seminars across the nation to groups of mental health professionals, criminal justice officials and social workers; and in most instances, has received feedback as a result. As a result of one such seminar, five attendees (who were either psychologists or psychiatrists) made women available to him for his studies. Although he had never testified at trial on the subject, he did testify before a grand jury in Georgia.

¶ 56 Based on these credentials, we find no error in allowing Hazelwood to render an expert opinion on the subject of the compliant woman. *See Jenkins*, 307 F.2d at 643–44; *Perry*, 561 P.2d at 114. The issue is not whether the witness has previously testified on the subject; it is whether "a witness is qualified as an expert by knowledge, skill, experience, training or education." *See* 12 O.S.1991, § 2702. We also find that testimony was properly admitted. Although Hazelwood was allowed to testify, he testified only as to characteristics in general. He was not allowed to mention Cecilia Johnson specifically, but was told to keep his testimony to general characteristics. He also did not offer an opinion as to whether Johnson constituted a "compliant woman." As such, the evidence was not improper. *See Davenport*, 806 P.2d at 660.

¶ 57 Appellant labels psychologist John Call a "professional witness" whose training was in the field of divorce and child custody. Call, who has a degree in law as well as being one of only approximately 120 board-certified forensic psychologists in the nation, presented his testimony solely to help explain the diagnoses of other professionals and the significance of those diagnoses. He did not testify as to any diagnosis he made independent of professional diagnoses made by Johnson's health care providers who actually had the opportunity to sit and talk with her (Call had never known Johnson while she was alive). Likewise, he did not attempt to tell the jury what Johnson did or what she could or could not do. He stated he was testifying "to provide information for [the

jury] to consider in helping understand other evidence which [they] may have heard." (8–30 Tr. 19).

¶ 58 Call explained to the jury the differences between personality traits, personality disorders and maladaptive coping mechanisms; how denial can become so powerful it can become a personality disorder; that some disorders are caused by organic brain damage or substance abuse. He told the jury Johnson had been diagnosed as having neurotic depression and major depression, a recurrent disorder. She also exhibited avoidant, dependent, and self-defeating personality traits. Call opined that a person with these general traits (1) repeatedly chooses people and situations that lead to mistreatment; (2) engages in self-sacrifice; (3) rejects opportunities for pleasure; (4) volunteers to do things that are demeaning or unpleasant; (5) is frequently preoccupied with fears of abandonment; (6) is easily hurt by criticism or disapproval; (7) avoids social occupational activities that involve significant interpersonal contact; (8) has difficulty expressing disagreement with others because of a fear or loss of support or approval; and (9) feels uncomfortable with being alone. Call obtained these characteristics from the Diagnostic Statistical Manual, a widely accepted publication used in the diagnosis and treatment of mental illness.

¶ 59 Based on these facts, we find no error. For the same reasons set forth in the discussions above, the trial court did not abuse its discretion in allowing Call to testify as an expert. The Evidence Code allows an expert to testify "in the form of an opinion or otherwise" if such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." 12 O.S.1991, § 2702. *See also* 12 O.S.1991, § 2703 (facts or data upon which an expert bases the opinion can be those made known to the expert before the hearing. Facts need not be admissible in evidence if it is of a type reasonably relied upon by experts in the particular field.). Nor are we concerned with the fact that Call's testimony was not all-conclusive. He admitted during cross-examination that such a person would not be in a zombie-like trance. He also admitted he pre-

fers to perform his own psychological tests and form his opinions from those, as one cannot always rely on what the patient said. He also admitted Johnson was not given some tests he would like to have seen; that at least one mental health professional saw Johnson only three times and another diagnosed her for insurance purposes. This evidence goes to the witness's credibility, not the admissibility of the evidence. *Diaz v. State,* 728 P.2d 503, 514 (Okl.Cr.1986).

¶ 60 Accordingly, this proposition is without merit.

## H.

¶ 61 In his thirteenth proposition of error, Appellant contends the State should not have been allowed to argue alternative theories of guilt to the jury. The prosecution's primary contention at trial was that Appellant left Ft. Riley, drove to Edmond, committed the murders, then returned to Topeka, where he met his family and spent the rest of the day. However, the trial court gave instructions on, and the prosecution also briefly argued in closing, that Appellant aided and abetted Cecilia Johnson in the murders. Under this scenario, it was Johnson herself who entered the Wuertz house and committed the killings; under this scenario, Appellant assisted her in the planning and commission of the murders.

¶ 62 Appellant cites *Lambert v. State,* 888 P.2d 494 (Okl.Cr.1994) and *Tibbs v. State,* 819 P.2d 1372 (Okl.Cr.1991) in support of his contention. These cases do not avail him. In *Lambert,* the defendant was charged with malice aforethought murder. The trial court gave instructions on felony murder. Appellant argued he was not given sufficient notice of this theory in the information, and this Court reversed on this basis. *Lambert,* 888 P.2d at 504. Likewise in *Tibbs,* this Court reversed because a defendant was not given sufficient notice that he could be convicted of felony murder when the underlying felony had not been alleged. *Tibbs,* 819 P.2d at 1376. In essence, both of these cases dealt with the due process violation that results when a defendant is not given sufficient notice of the theory under which he is charged

because the information is not specific enough in its allegations.[8]

¶ 63 Such is not the case here. Unlike the cases where a different *legal* theory of guilt was instructed upon, this case deals with alternative *factual* theories having the same legal basis, i.e., that Appellant either directly committed or aided and abetted in the commission of malice aforethought murder. This situation is similar to that in *Cannon v. State*, 904 P.2d 89, 99 (Okl.Cr. 1995), *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996). There, the appellant's complaint was that the instructions allowed a finding of guilt whether he actually committed the murders, or merely aided and abetted his partner in committing the murders. We noted that, under the aiding and abetting theory, the jury had to find the defendant was a principal to the crime. There as here, the instructions "explicitly refer[red] to the underlying charged crime and indicate[d] that the elements of the charged offense must be proved." *Id.* There, as here, when "[r]ead as a whole, the instructions clearly required the jury to find that [the defendant's] conduct caused [the victim's] death and that he intended to take her life, or that he aided and abetted [his part-

ner's] acts knowing of and sharing in [the] intent to take [the victim's] life." As the instructions were correct, the court did not err in allowing the State to argue, however, briefly, that Appellant aided and abetted Cecilia Johnson.[9] This proposition is without merit.

I.

¶ 64 For his twenty-third and last proposition of error, Appellant contends the cumulative effect of errors at trial mandate that his case be reversed and remanded for a new trial, or that his sentences be modified. We shall address this contention in connection with Appellant's first proposition of error, below.

III.

*SECOND–STAGE ISSUES*

A.

¶ 65 In his fifteenth proposition of error, Appellant complains that his protection against Double Jeopardy was violated because in each murder count, the jury found the aggravating circumstance of "great risk

8. Since these two cases were handed down, this Court in *Parker v. State*, 917 P.2d 980, 985–86 (Okl.Cr.1996), *cert. denied*, — U.S. —, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997) has restated the standard this Court will use in determining whether an information is sufficient to give a defendant notice of what he is being charged with. Specifically, this Court will determine "whether the Information gives the defendant notice of the charges against him and apprises him of what he must defend against at trial." *Id.* at 986. This determination will be made on a case-by-case basis. *Id.* This Court will "look to the 'four corners' of the Information together with all material that was made available to a defendant at preliminary hearing or through discovery to determine whether the defendant received notice to satisfy due process requirements." Only if this Court finds the defendant did not have sufficient notice will a due process violation be found. *Id.*

9. Although in light of this discussion we do not decide the question, there is another theory upon which to base the court's giving the instruction: the instruction was warranted based on the evidence presented by the defense. Appellant's theory at trial was his alibi defense. However, defense counsel also strongly implied that John-

son herself committed the murders. *See* 9–15–94 Tr. 38, 40 (Nicki Bonner testified that Appellant had told her the evening of July 3rd that the only thing he could think was that Johnson had committed the murders; that he could not understand why she would do a thing like that, unless she heard Appellant complain about the nuisance she was being); 9–19–94 Tr. 75–76 (Bonner testified she believed Johnson was not responsible for her behavior, labeling her as an out-of-control psychotic); 5–31–94 Tr. 146 (uncontradicted statement by prosecution in pre-trial session that defense counsel had argued through pleadings and otherwise provided indications that Appellant was not responsible for these crimes; rather, Johnson was); 7–7–94 Tr. 116 (questioning of witness by defense counsel in attempt to discredit agreement between Johnson and prosecution, where counsel stated there was no dispute that Johnson got immunity so long as she did not put herself at the scene of the crime); 10–3–94 Tr. 11 (uncontradicted comment by prosecutor during bench conference that defense counsel had offered evidence pointing to Johnson as the murderer). Defense counsel denied a strategy of pointing to Johnson as the murderer, instead claiming the evidence presented was to show sloppy investigation on the part of authorities (9–22–94 Tr. 133–34).

of death of more than one person" (21 O.S. 1991, § 701.12(2)).

¶ 66 The prosecution's theory was that Appellant entered the Wuertz house, surprised Melody as she was preparing to go to work; incapacitated her by firing a bullet into an area of the spine which would paralyze but not kill; killed baby Jessica by shooting her in the head; then killed Melody by firing a bullet into her head. Appellant alleges that under these circumstances, a person can only create a great risk of death to more than one person one time. We find no double jeopardy violation here, but an explanation of the aggravating circumstance is necessary to show why.

¶ 67 Although it is obvious, it bears repeating that any aggravating circumstance to be constitutionally valid must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed

guidance,' and that 'make rationally reviewable the process for imposing the sentence of death.'" *Paxton v. State*, 867 P.2d 1309, 1324 (Okl.Cr.1993), *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980) (footnotes omitted)). The rationale behind this aggravator is that, by its very language, there must be a risk of death, that risk must be to more than one person, it must be great, and the defendant must know that risk exists.

¶ 68 We have interpreted this in two different ways. First, we have held that the fact more than one person is killed satisfies the requirement for the aggravator.[10] We have also held that more than one person need not be killed; it is sufficient that the defendant knowingly created a great risk of death to others.[11]

**10.** See *Hain v. State*, 919 P.2d 1130, 1147 (Okl. Cr.), *cert. denied*, —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996) (Defendants set fire to a car with two people in the trunk); *Cargle v. State*, 909 P.2d 806, 832 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996) (Defendant aided and abetted accomplice by shooting one victim while the accomplice shot the other); *Hooker v. State*, 887 P.2d 1351, 1364 (Okl.Cr.1994), *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995) (This Court stated that "killing more than one person is sufficient to support this aggravating circumstance," and concluded that the killing of the defendant's wife and her mother was "sufficient to support the aggravating circumstance of great risk of death to more than one person."); *Stafford v. State*, 853 P.2d 223, 225 (Okl.Cr.1993) (The "fact that appellant killed three innocent people supported the jury's determination that he created a great risk of death to more than one person."); *Sellers v. State*, 809 P.2d at 691 ("That fact of contemporaneous multiple killings of people in the same room amply supports the jury's determination."); *Stafford v. State*, 665 P.2d 1205, 1217 (Okl.Cr.1983) (Fact that defendant herded six victims into a meat freezer the size of a closet and opened fire at close range, killing all of them, was sufficient to find the presence of the aggravating circumstance).

**11.** See *Cartwright v. State*, 695 P.2d 548, 555 (Okl.Cr.1985), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985), *habeas writ granted on other grounds*, 822 F.2d 1477, *aff'd.*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (one person killed, one person nearly died before being taken to the hospital); *Pennington v.*

*State*, 913 P.2d 1356, 1370 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996) (although only one person killed, the firing of a weapon in the "small, enclosed" area of a convenience store where others could have been killed satisfied the finding the aggravator was present); *Paxton*, 867 P.2d at 1330 (fact that defendant "shot three (3) people at close range inside a small frame house and pursued both Linda Neal and Edward Peters in an attempt to further harm them" was sufficient to satisfy requirements for this aggravator); *Smith v. State*, 727 P.2d 1366, 1373 (Okl.Cr.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) (evidence sufficient where the defendant during the continuing course of conduct in which a murder is committed threatened the life of another and had the apparent ability and means of taking that person's life.); *Ross v. State*, 717 P.2d 117, 123 (Okl.Cr.1986), *aff'd*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (After shooting policeman, defendant threatened motel clerk with death if she did not cooperate with him. Deemed sufficient to satisfy aggravator); *Jones v. State*, 648 P.2d 1251, 1260 (Okl.Cr. 1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983) (Fact that defendant shot and killed one person, then shot and seriously wounded two others was sufficient). We have also noted our prior cases establish that "it is not the death of more than one person which supports this aggravating circumstance, but the defendant's acts that create the risk of death to another which are in close proximity, in terms of time, location and intent to the act of the killing itself." *Snow v. State*, 876 P.2d 291, 297 (Okl.Cr. 1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995).

¶ 69 We see no conflict between these holdings. The rationale for the aggravator—that is, the reason it is constitutionally adequate—is that it differentiates one murderer from another by demonstrating a particular state of mind at the time of the murder. Unlike the aggravating circumstance of a prior violent felony, which demonstrates a defendant's past actions, or continuing threat—which indicates a defendant's future dangerous actions—this aggravator gives insight into a defendant's state of mind at the time the murder was committed. It evinces a knowing, reckless and utter disregard for the sanctity of human life by posing a significant risk of death to others. *See Pennington,* 913 P.2d at 1370 (Finding that "the act of repeatedly firing a shotgun in a rather small, enclosed area such as a 7–11 store is a reckless act. [The other person in the store] could easily have been killed by one of those shotgun blasts."); *Smith v. State,* 727 P.2d 1366, 1373 (Okl.Cr.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) (evidence is sufficient to support the aggravating circumstance "where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life."). Because both of the listed examples satisfy this requirement, yet still channel a jury's discretion, it follows that a finding under either factual theory would be sufficient.

¶ 70 In light of the above discussion, Appellant's argument must fail. Based on the evidence presented at trial, it is obvious that in at least one instance, Appellant was "found guilty" of this aggravating circumstance not because there were other people present who could have been killed, but because he killed two people by actions which were in close proximity in terms of both time and space, the nature of which were "rapid and fluid." *Cartwright,* 695 P.2d at 555. *See also Snow,* 876 P.2d at 297. There was no duplication of circumstances, as in each murder Appellant evinced the same callous, reckless disregard for the sanctity of human life. *Cf. Davis v. State,* 888 P.2d 1018, 1021 (Okl.Cr.1995) (defendant shot four people in the head, killing two. Later told parole officer he felt shoot-

ings were justified and was only sorry that one of his intended victims had not died.).

¶ 71 We therefore find this proposition to be without merit.

### B.

¶ 72 In a related proposition, Appellant contends there was insufficient evidence to support the jury's finding Appellant knowingly created a great risk of death to others. When the issue of sufficiency of the evidence regarding an aggravating circumstance is raised on appeal, this Court will utilize the test of "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Woodruff v. State,* 846 P.2d 1124, 1147 (Okl. Cr.1993), *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Furthermore, the evidence must be viewed in the light most favorable to the State. *Romano v. State,* 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

¶ 73 Here, that standard is easily met. The victims were lying in or near the hallway of the house. They were but a few feet apart. Evidence indicates they were killed within minutes of each other. Evidence also showed Appellant killed Jessica to avoid being forced to pay State-ordered support for the child; he killed Melody because she had involved the State in matters which he believed was none of the State's business, and because he could not simply kill Jessica without Melody knowing about it. We find these facts satisfy the requirement that the killings occur in close proximity in terms of time, location and intent. *Snow,* 876 P.2d at 297. This proposition is without merit.

### C.

¶ 74 In his seventeenth proposition of error, Appellant alleges there was insufficient evidence to support the finding that the murder of Melody was especially heinous, atrocious, or cruel. Using the same standard of review as enunciated above, we find this proposition to be without merit as well. The evidence indicates that Appellant shot Melody in the cervical spine, which left her paralyzed and unable to move. While she was in this state, Appellant killed Jessica. In the

light most favorable to the prosecution, this indicates both physical and mental suffering. We find Appellant intentionally committed acts—murdering Melody's baby virtually in front of her eyes—which created a significant level of tension in Melody, thus creating extreme mental cruelty. *See Hain,* 919 P.2d at 1146.

### D.

¶ 75 In his eighteenth proposition of error, Appellant contends he was denied a fair sentencing hearing due to the admission of improper victim impact testimony.[12] He also complains the jury was not properly instructed concerning the use of the victim impact testimony. At trial, defense counsel objected to the evidence because it injected "extraneous matters" which were not important to the ultimate decision in the case. Defense counsel also lodged a general objection to the use of the evidence. On appeal, Appellant objects to the evidence because it was irrelevant, and its probative value was far exceeded by its prejudicial effect. To the extent the objection on appeal is different from

12. Susie Wuertz, Melody's mother and Jessica's grandmother, gave evidence in a question-and-answer format. She told the jury that she would never forget the "wonderful, wonderful feeling" she had when Melody was born. She also noted that, although Melody was stricken with epilepsy in the eighth grade, it did not stop her from doing the things she wanted to do. Melody was active in many school activities. She told the jury that although there were difficulties associated with Jessica's being born out of wedlock, "I really and truly feel that Jessica was a gift from God to her because it made a change in her and just a change in her life." She noted that Jessica was "a lot like her mother, very, very cheerful, seldom ever cried, not that she wasn't normal with crying, but she was just a very cheerful little child with a bright sparkle in her eyes.... She was an extremely beautiful child. Personality-wise, you just wanted to hug her all the time." "I don't know that it's possible to put into words the kind of feeling that you have about loss. Melody was our only daughter. Melody was our special daughter. Melody was our daughter that we had—during her high school and college years that we had to encourage a lot. Sometimes when you have a child that is the quote, unquote, perfect child, I think you don't become as close to them because you haven't had to live through some problems, and most of our problems of encouraging Melody had to do with her epilepsy and certainly that wasn't anything that, you know, was her fault. It was just something you had to overcome. I'm—we had lots of plans for the future with Melody and Jessica."

Wesley Wuertz, Melody's brother, recalled that he and Melody had a normal brother-sister relationship in their earlier years, but had become closer in the past few years. He was extremely proud of Melody, as she was doing well on her own. He noted the deaths had a definite impact on his life. Wesley, who had been a minister, said his whole life had changed, explaining that being in the ministry can take its emotional toll. He added when Melody died, "it was an outside of the ministry influence that required a large portion of my emotional energy, my emotional budget, just to get through, to deal with the grieving process. You know, not just for two or three weeks or two or three months, but up to and including today, and it just required that I concentrate more time on that than I—or energy on that than I could afford and still remain full-time ministering. And essentially I've had to take some time off the ministry and time off my plans for the future and step out of the ministry for a while, a sabbatical we call it, to spend time dealing with the emotional chaos this has brought for me and my family and has put my life on hold." As a result, to support his family, he was at the time doing carpentry work, painting, and other things that did not require a lot of emotional involvement.

Lyle Wuertz, Melody's father, testified as to Melody's epilepsy and how it influenced her life. He echoed many of the same thoughts as his wife. Although he and Melody had had squabbles while she was growing up, he felt their relationship had greatly improved, and had been looking forward to seeing their relationship continue to improve. He ended by relating events which had transpired the last time he had seen the two:

Well, the last time that I seen Jessica was—and Melody was the end of May when they come home to visit us, and I thank God for the memories that I have, that God gave us memories that we can cherish, because one of the memories that I'll cherish the most is whenever Melody and Jessica's grandmother finished giving Jessica a bath one evening, put her in some fresh pajamas, and she come in and crawled up on my lap in my chair, and she crawled right up on my shoulder, and she laid there and I rocked her, and I rocked that angel to sleep. I will never forget that feeling, that good, warm feeling that I had, and I thank God for those memories.

For me to sit here and try to—it's just impossible for me to recap 29 years of my daughter's life in just a few moments, and I loved her very much, and I'll miss them both very much, and I'll missing seeing—well, right now Jessica would have been four years old and I can just see her little towhead, big brown eyes. I'm going to miss all that joy, but I thank God for the memories.

By agreement, no opinion as to punishment was elicited or given. In each instance, the witness was not cross-examined.

what was imposed at trial, this proposition is waived for all but plain, reversible error.

¶ 76 We find no such error. We have already determined such evidence is relevant. *Ledbetter v. State,* 933 P.2d 880, 891, (Okl.Cr.1997); *Cargle v. State,* 909 P.2d 806, 827 (Okl.Cr.), *cert. denied,* —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). As such, it is not extraneous, and it is important to the factfinder's determination of an appropriate punishment. At least one of the family members related how the deaths had affected his life, as he had to temporarily take up another, less emotionally demanding job. We find no error in the testimony. The question-and-answer format used by the prosecutor kept narratives to a minimum, and it appears the prosecutor took pains to decrease the risk of an emotional outburst; we see nothing in the record indicating an emotional outburst occurred. In short, we find no evidence the jury based its determination on emotion rather than reason, as Appellant claims.

¶ 77 Appellant also complains the court erred when it did not give any instruction to the jury on how to use the victim impact evidence. Again, Appellant has waived all but plain, reversible error by failing to interpose this particular objection at trial. We find no such error here. Although no instructions were given similar to those laid out in *Cargle,* 909 P.2d at 828–29, this Court has reviewed the evidence, along with other evidence presented in the second stage, and is capable of reviewing the evidence under the proper standard. *Ledbetter,* 933 P.2d at 894. After a thorough review, we do not find that the jury misapplied the evidence and arrived at an erroneous sentencing decision as a result.

¶ 78 Accordingly, this proposition is without merit.

### E.

¶ 79 In his twentieth proposition of error, Appellant contends the jury was misled as to the proper burden of proof. Specifically, he points to a comment by the prosecutor in his second-stage closing where he tells the jury that, once they have the aggravating circumstances and mitigating circumstances the

jury can then "simply weigh the two, and if you believe—and this is not—this is what I want to emphasize. This is not one of those beyond a reasonable doubt parts because you've already found in theory that—"; at that point defense counsel objected. After a bench conference, the prosecutor continued as follows:

> [I]f you have established to your satisfaction, if you are satisfied beyond a reasonable doubt that a—that the conduct, the planning, the planned killing of one or more persons, that being both Melody and Jessica Wuertz, is—exists beyond a reasonable doubt, therefore, you found that as an aggravating circumstance in existence, and then if you weigh that up against the items that the defense of the Defendant wants you to consider as mitigating circumstances and if you find—and I reiterate. This is not another burden to prove to you beyond a reasonable doubt, but if you find that that aggravating circumstance, the planning to kill Melody and Jessica Wuertz, outweighs the mitigating—

(10–7 Tr. 109–10). The prosecutor finished his point after another objection. This portion shows the prosecution did not mislead the jury as to the proper burden of proof. The prosecutor's statement of the law is correct. *See Paxton,* 867 P.2d at 1323 ("It is sufficient that the jury is instructed to weigh the mitigating and aggravating evidence, and only when the aggravating circumstances clearly outweigh the mitigating may the death penalty be imposed."). *See also* OUJI–CR 2d instructions 4–76 and 4–77 (requiring a unanimous finding of aggravating circumstances beyond a reasonable doubt) and 4–80 (if aggravating circumstance found beyond a reasonable doubt, death penalty cannot be imposed unless jury also finds such aggravating circumstance outweighs any mitigating circumstances found).[13]

¶ 80 The comment, when taken as a whole, accurately reflects the law in this State. This proposition is without merit.

### F.

¶ 81 For his next proposition of error, Appellant asserts that the death penalty

---

**13.** OUJI–CR 2d instructions were not in effect at the time of Appellant's trial.

is unconstitutional under the Oklahoma Constitution. Citing Article 2, § 2 of the Constitution, Appellant argues that if "[a]ll persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry," each Oklahoman has the "inherent" right to life, and the death penalty must therefore be abolished.

¶ 82 At and before trial, defense counsel argued the death penalty was cruel and unusual punishment. He did not advance the argument he now advances. Accordingly, he has waived it for review on appeal. *Edwards v. State*, 655 P.2d 1048, 1050 (Okl.Cr.1982); *Tubbs v. State*, 631 P.2d 758, 759 (Okl.Cr. 1981).

¶ 83 Nor do we find the death penalty violates this section of the Oklahoma Constitution. On its face, Appellant's argument falls short. The most obvious reply is that, if Appellant has an "inherent" right to live, so did his victims. Our own Supreme Court has noted that the right to labor or earn one's livelihood in any legitimate field of industry or business is a right of property, and any unlawful or unreasonable interference with or abridgment of such right is an invasion of that right, and a restriction of the liberty of the citizen as guaranteed by the Constitution. *Herrin v. Arnold*, 183 Okla. 392, 82 P.2d 977, 979 (1938). Surely killing a person infringes on that same right. Appellant has presented nothing to this Court showing that the Legislature's ability to establish a punishment of death for first degree murder in any way violates his "inherent" right to life.

¶ 84 This proposition is without merit.

## IV.

### *INEFFECTIVE COUNSEL CLAIMS*

¶ 85 Appellant alleges he was denied his right to effective assistance of counsel. To prove ineffective assistance of counsel, Appellant must show not only that his attorney's performance fell below acceptable levels of professionalism, but also that this substandard performance had an effect on the outcome of the proceeding. Unless an appellant can show both, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See also Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

¶ 86 In support of his contention, Appellant merely states that, if in any of the propositions he has set forth, this Court has deemed the issue waived, counsel was ineffective. We have carefully reviewed each instance in which such a waiver has occurred, and find Appellant cannot show prejudice.

¶ 87 Appellant also contends trial counsel was ineffective for failing to call as a defense witness Edmond Police Detective Dennis Dill, who he contends had information concerning the last time the child had eaten. We find we cannot address the issue at this juncture in the appeal process. As we noted earlier, Appellant in support of a request for an evidentiary hearing filed a motion to supplement the record pursuant to Rule 3.11, 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals* on June 13, 1996. That motion was denied by this Court on July 3, 1996, because it did not meet the threshold requirements of Rule 3.11. As above, Appellant has provided no other evidence to support this allegation. Consequently, we find it to be without merit. *See* Rules 3.5(A)(5) & (C)(1), 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals.*[14]

¶ 88 Appellant also complains because counsel did not present to the jury evidence

---

14. But even if we were to address the issue, it would have no merit, for the same reasons it would have had no merit in Appellant's fourth proposition. The detective would have testified he was unable to find any food containers at the crime scene which matched the contents of baby Jessica's stomach as found by the medical examiner. The medical examiner testified that the stomach contents were hardly digested at all, indicating she had eaten only a very short time before she was killed. Evidence at trial indicated that Jessica had been fed the same kind of food as found in her stomach at approximately 7 p.m. the evening before she was killed. For Appellant's theory to have been valid, he would have had to convince the jury that Jessica was

of his life as a nurse and the good he did his patients. Although no evidence was brought forth in this form, evidence was presented that Appellant was a competent nurse, and that even in episodes where he may have been irritated by his patients, he did not display that irritation in front of the patients. Here, as above, Appellant cannot show prejudice.

¶ 89 The same is true of Appellant's allegations trial counsel could have shown that he loved his family and cared for his ailing mother. Evidence of both these traits was presented during the course of the trial. Indeed, evidence showed an already irritated Appellant became even more irritated when informed that Jessica, even as an unwanted heir, would be entitled to a portion of his estate, thereby diminishing the amount which could be distributed among his cherished family members. Accordingly, it would have made no difference had it been presented in another form. Again, Appellant cannot show prejudice.

¶ 90 He also contends trial counsel did not give adequate reasons why the jury should not find the aggravating circumstances present. However, appellate counsel has failed to support this broad contention with specific examples. It is thereby waived on appeal. *See* Rules 3.5(A)(5) & (C)(1), 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals.*

¶ 91 This proposition is without merit.

## V.

### ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

¶ 92 In his fifth proposition of error, Appellant contends prosecutorial misconduct in

the first stage proceedings denied him a fair trial. In his nineteenth proposition of error, he complains of prosecutorial misconduct which he alleges occurred in the second stage of trial. We shall address the first stage issues first.

### A.1.

¶ 93 Appellant first complains that during *voir dire,* a prosecutor alluded to terrorists who blew up the World Trade Center in New York City. However, he has failed to provide this Court with citation to the transcript where the error occurred. Accordingly, we cannot address the alleged error. Rule 3.5(A)(5), 22 O.S.Supp.1996, Ch.18, App., *Rules of the Court of Criminal Appeals.*[15]

¶ 94 Appellant also complains the prosecutor during *voir dire* made improper remarks concerning the nature of a criminal case. Specifically, defense counsel objected to the question by the prosecutor that "if different theories that are tossed into your lap of who done it, if you will, if when you hear the evidence that we present to you—" However, the record shows that, after defense counsel objected (saying "a criminal trial is never a who done it, it's a they prove it."), both the court and the prosecutor agreed, and the prosecutor corrected his question.[16] Any error which may have been present was therefore corrected, and is harmless.

¶ 95 The same is true of Appellant's complaint the prosecutor confused the term "reasonable doubt." The record shows the prosecutor used the term "reasonable conclusion" in connection with evidence to be presented

---

killed within a short time after she had eaten at approximately 7 p.m. on July 1 at the baby sitter's house, that Melody then transported the dead baby from the baby sitter's to her own house; and that neither she nor the baby sitter reported the murder. This is a ludicrous theory, one that no rational trier of fact would subscribe to. Accordingly, even if we were to consider the evidence, Appellant could show no prejudice for failing to call Dill to the stand.

15. The State in its brief-in-chief does provide a specific citation to the record. Consequently, although the Appellant has waived review of the comment, we shall examine it to determine if

plain, reversible error occurred. We find none. Taken in context, it is clear the prosecutor was not drawing parallels between Appellant's case and the bombing of the World Trade Center; rather, he was using the bombing to make a point as to the kinds of evidence which might be left at the scene.

16. "All right. If you believe, sir, beyond a reasonable doubt that the evidence we present to you lends only one reasonable theory, cause you to come to only one reasonable conclusion—" (5–16 Tr. 138).

in the case, prompting defense counsel to point out "he left out the reasonable conclusion, reasonable beyond a reasonable doubt." The court clarified by asking the juror "[i]f [the evidence] leads you to that conclusion of guilt beyond a reasonable doubt, can you find him guilty?" As a follow-up, the prosecutor reminded the jurors that the prosecution's burden of proof was "beyond a reasonable doubt" (5–16–94 Tr. 140). Error, if any, was corrected.

### 2.

¶ 96 Appellant next claims the prosecutor accused his main defense witness of committing perjury. The witness, Nicki Bonner (Appellant's ex-wife), had testified that Appellant was with them all day on July 2. She detailed the family's activities that day as follows: they began by eating a late breakfast at approximately 12:30 p.m. at a local restaurant. Following the meal (between 1:15 and 1:30 p.m.), the family drove by a nearby lake, then went to Topeka. In Topeka, they stopped at a large discount department store; there, Appellant bought his daughter, Amanda, a watch at the jewelry counter at approximately 3:30 p.m. The family bought other items, checking out at the main register. A receipt for these other items showed they checked out at 4:16 p.m. They then filled up the car with gasoline at a nearby service station; and drove to a Topeka mall, where they arrived at approximately 4:30 p.m. They made several purchases at various stores in the mall, then went to a motion picture at a theater in the mall at approximately 7 p.m. Following the movie, the family returned to Appellant's quarters at Ft. Riley, arriving there at approximately 10:30 p.m.

¶ 97 In his closing argument, the prosecutor told the jury that

[F]or the record, the State of Oklahoma will not pursue this woman an [sic] a perjury count for any of her testimony. Our business is with that guy right there. We're done with Nicki Slaughter. So there's no retaliation, no threat, no fear. That's been no surprise, but let me just state it for the record. The State of Okla-

homa waives—we waive on the record now, Your Honor—.

At that point, defense counsel objected, saying "[t]he gratuity is improper and it—." The prosecutor responded by saying "[t]hey can attack—," but was interrupted by defense counsel who said "—it's not sure that he's going to keep it anyway. So we object to it." The objection was overruled (10–5 Tr. 98–99).

¶ 98 As the above evidence shows, the testimony of Nicki Bonner was important to the defense case: if the jury believed her testimony, it would have been physically impossible for Appellant to be in Edmond killing Melody and Jessica Wuertz at approximately noon, and at the same time be in a restaurant near Ft. Riley, some 282.7 miles and four hours, 23 minutes away.

¶ 99 Initially, it must be noted the basis for defense counsel's objection at trial is unclear. It appears defense counsel was objecting on the basis that the prosecutor may not keep his word about not filing perjury charges against Nicki Bonner. In any case, the basis for the objection at trial is not the same as it is on appeal. Consequently, Appellant has waived the claim for all but plain, reversible error. *Simpson,* 876 P.2d at 702.

¶ 100 It appears the comment was invited error. In his closing statement, defense counsel Williams pointed out to the jury the inconsistencies in their theory of the case by commenting that on the one hand, the prosecution argued Appellant committed the murders to prevent Bonner's knowledge of the illicit affair, while on the other hand acknowledging that Bonner would certainly learn of the affair after a murder. Mr. Williams than argued the prosecution could not explain why Bonner maintained the alibi despite knowledge of this and other affairs and actions. He added Bonner had maintained her story even on threat of prosecution, stating that state investigators would "do everything they can to break that woman's mind, will, and spirit and corrupt her to the point that she would say what they wanted to hear, which she said would have been a lie." (10–5 Tr. 26–28). Later in his argument, Mr. Williams addressed Mr. Wintory directly by asking him: "What I want you, sir, when you have a

chance to close for the State of Oklahoma, to tell our jury the evidence, one scintilla of which you used to get an indictment from that grand jury against Nicki Slaughter now Bonner, one shred." (10–5 Tr. 41). Defense counsel then argued the only reason Bonner had been indicted for murder [17] was to pressure her to testify against Appellant. He argued that Bonner knew that "with the mentality of the State of Oklahoma in this case that when she takes that stand under oath to God to tell the truth and tell things that he and the State of Oklahoma don't want to hear that they have the power of perjury? It didn't scare her off." (10–5 Tr. 42).

¶ 101 This Court has traditionally taken the view that an appellant cannot complain if the comments by a prosecutor were invited by defense counsel. In fact, this Court has gone so far as to imply that the mere fact an error was invited is dispositive of the issue.[18] However, the fact that an error was invited is not dispositive of the issue.

¶ 102 This Court in its later rulings has relied upon *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) in support of its holdings. *See, e.g., Hogan v.*

*State*, 877 P.2d 1157, 1163 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995). There, the Court made clear the issue before it was "but one example of an all too common occurrence in criminal trials—the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action," adding that "[c]learly two improper arguments—two apparent wrongs—do not make for a right result." *Id.* at 11, 105 S.Ct. at 1044. Reviewing earlier holdings, the Court set forth the appropriate standard:

This Court's holding in *Lawn* [*v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) ] was no more than an application of settled law. Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other

**17.** Bonner was indicted by the grand jury for the murders, and was charged the same way when the indictment was dismissed and an information was filed against her. The charges against her were dismissed at the conclusion of the preliminary hearing due to lack of evidence. Cecilia Johnson had testified at the grand jury proceedings, but had committed suicide before the preliminary hearing. Therefore, what evidence she may have presented was not a part of the record at trial.

**18.** *See Ezell v. State*, 909 P.2d 68, 73 (Okl.Cr. 1995) ("This Court also refuses to countenance relief for invited error."); *Pierce v. State*, 786 P.2d 1255, 1259–60 (Okl.Cr.1990) ("The answers to which Appellant now objects resulted purely through the persistence of his own counsel. We have often recognized the well established principal that a defendant may not complain of error which he has invited, and that reversal cannot be predicated upon such error."); *Smith v. State*, 759 P.2d 232, 233–34 (Okl.Cr.1988) (noting conduct of prosecutor in making improper closing argument was "ordinarily one [which is] reversible error despite the weight and admissibility of additional evidence," Court noted that "[t]he error complained of was invited by the appellant's counsel. Therefore, he cannot be heard to complain, on appeal, that the trial court erred in allowing the jury to hear this testimony."); *Casey v. State*, 732 P.2d 885, 888 (Okl.Cr.1987) ("The rule is well settled that a party may not complain

of error which he himself has invited. Error, if any is shown, was clearly invited and not grounds for an error recognizable on appeal."); *Satepeahtaw v. State*, 595 P.2d 805, 809 (Okl.Cr. 1979) ("Finally, even if the prosecutor's remark was improper, it may be excused under the doctrine of invited error."); *Kiddie v. State*, 574 P.2d 1042, 1048 (Okl.Cr.1977) ("This Court has held that the defendant shall not be permitted to profit from any alleged error which the defense counsel in the first instance invited by opening the question or by their own conduct."); *Fox v. State*, 524 P.2d 60, 63 (Okl.Cr.1974) ("We are of the opinion that if this constitutes error, it is invited error upon which a reversal of conviction may not be predicated."); *Sasser v. State*, 414 P.2d 714, 716 (Okl.Cr.1966) (quoting *Pierce v. State*, 383 P.2d 699, 705 (Okl.Cr.1963), the Court observed that "[t]his Court has repeatedly held that an appellant 'will not be permitted to profit by an alleged error which he or his counsel in the first instance invited by opening the question or by their own conduct; and counsel for the defendant may not profit by whatever error was occasioned by the admission of such incompetent evidence.' "); *Menefee v. State*, 640 P.2d 1381, 1384 (Okl.Cr.1982) ("Appellant Jones invited the judge's admonishment to the jury, and having done so, will not be heard to complain on appeal.").

words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

In retrospect, perhaps the idea of "invited response" has evolved in a way not contemplated. *Lawn* and the earlier cases cited above should not be read as suggesting judicial approval or—encouragement— of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.

In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

Courts have not intended by any means to encourage the practice of zealous counsel's going "out of bounds" in the manner of defense counsel here, or to encourage prosecutors to respond to the "invitation." Reviewing courts ought not to be put in the position of weighing which of two inappropriate arguments was the lesser. "In-vited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.

Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond. Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him, thereby rendering the prosecutor's response unnecessary. Similarly, the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury. Defense counsel, even though obviously vulnerable, could well have done likewise if he thought that the prosecutor's remarks were harmful to his client.

*Id.* at 11–13, 105 S.Ct. at 1044–45 (citations and footnotes omitted). This is more in keeping with other opinions by this Court which either modified or reversed based on error, even though it was invited. *See Starr v. State*, 602 P.2d 1046, 1049 (Okl.Cr.1979) ("It is true that an appellant cannot complain of error which he invited by first raising the subject. *Luker v. State*, 504 P.2d 1238 (Okl. Cr.1972). However, when the situation has required it, we have nevertheless considered the merits of issues, even though they were first broached by the defendant."); *Manuel v. State*, 541 P.2d 233, 239–42 (Okl.Cr.1975) (comments plus other errors mandated reversal).

¶ 103 Clearly here, the prosecutor's comment was unwarranted and error. However, defense counsel was also not without blame.[19]

---

19. We find it somewhat ironic that appellate counsel complains because Mr. Wintory inferred the witness was lying. Defense counsel occasionally stepped over the line in three different ways: attacks against the prosecution, attacking witnesses personally; and a combination of those two.

The following are representative of defense counsels' attacks against particular witnesses:

Mr. Coyle told the jury he called one witness "to see if, through all her gum chewing when she was on the stand, you could really evaluate if she would have known there was a man there or not." (10–4 Tr. 20). When discussing the testimony of the two boys who saw Appellant near the house near the time of the deaths, Mr. Coyle noted that "Some of them are just flat, he lied, but that's for you to determine." (10–4 Tr. 51).

When one witness recalled Johnson's reactions to the newspaper article in which she was named, Mr. Coyle suggested to the jury that the witness had been reading the newspaper too much (10–4 Tr. 75). In evaluating another witness, he said "and Evelyn Cunningham came up here and she lied. She not only lied in the report, she lied in court. There's no perjury charges against her. She lied, but that's okay because she's talking against JR." (10–4 Tr. 86). Discussing the testimony of informants, he asked why, if the prosecution's case was so good, why they had to call these "liars" to the stand (10–4 Tr. 123). Mr. Coyle finished up his argument by stating: "This case boils down to, as I said, do you believe the boys and snitches beyond a reasonable doubt?" (10–4 Tr. 132). Mr. Williams, although more restrained, was also not without improper comments. He told the jury that to fill the gaps in the prosecution's case, the prosecutors "dipped into the human gutter pile of snitches" and produced a witness who said Appellant said he was actually sitting in a Dodge Shadow, adding that "I'll talk to you more about these miscreants, these pieces of human driftwood that are paraded up here." He observed the prosecution presented three jailhouse "snitches—correction, two snitches and one rat. Two." (10–5 Tr. 21–22). Mr. Williams also made reference to a "contingent fee contract to lie" made between the inmates and prosecutors (10–5 Tr. 37).

Defense counsel were even more forceful in their references to members of the prosecution team. In discussing some evidence presented by the defense but known to the prosecution, Mr. Coyle told the jury the evidence "doesn't fit very well with their drive time, so they've done their best to try to kick this out." (10–4 Tr. 22). Contrasting the evidence presented by the two sides, he said "evidence is what we go on in this courthouse. They just make it up." (10–4 Tr. 28). In a similar vein: "They don't want to learn the truth. They want to make him guilty. They got him in jail." (10–4 Tr. 31). In a similar vein is the following: "You see, this is something else, ladies and gentlemen, that they just make up. If they don't have the evidence, they just make it up. And they say it and because they say it you're supposed to believe it's so because they say he hopped a fence. Where in the world is the evidence of that? Let's just make it up. Let's make up that what—what they were doing on the 7th or the 8th. Or let's make up what they did on the 11th, is the day he's discharged. Let's just make it up." (10–4 Tr. 45). At one point, Mr. Coyle personally addressed the investigating officer in the case (and her failure to testify) as follows: "Did we have—did you see Detective Pfeiffer, who's been sitting over here grinning, did you see her take the witness stand and tell you that, I didn't scare that little girl? You sure didn't. You know, Detective Pfeiffer, why did you scare her. Why did you do that? Why didn't you try to be fair?" (10–4 Tr. 32). Referring to expert witnesses called by the prosecution, Mr. Coyle noted: "Now, some real important evidence in the case. Since there's zero evidence of JR at the crime scene, let's call some police witnesses who know all the answers before they take the test." (10–4 Tr. 116). Referring to a diagram of a wound made by the medical examiner, Mr. Coyle said the investigator retrieved knives at Appellant's home in accordance with specifications given him by the medical examiner, before she made a drawing that "she and Mr. Wintory cooked up for trial." (10–4 Tr. 124). Referring to the prosecution's theory of a murder weapon, Mr. Coyle told the jury the prosecution team "want to pull back and tell you that that is the murder weapon. Ladies and gentlemen, they are making that up. They don't have a murder weapon. They are making that up." (10–4 Tr. 125). Mr. Williams also attacked the investigator in the case by criticizing the way she handled a photographic lineup: "what is it our fair-minded, thorough, and professional investigator did? The one with the open mind, the one who wants to be fair, because that's what you would expect and demand of them." After describing what he deemed the investigator's actions, he added: "Is that fair? Is that what you expect of your prosecuting and investigating official to do with a little kid?" (10–5 Tr. 16–17). In a similar vein, he added: "You want to talk about manipulation, to take a child and cause him to pervert the truth as you know it to be by saying a Dodge is a Nissan. I don't know how you view that, but I assign it to you as disgusting. It's unfair. And it's untrue. But that's what they did. And perhaps Mr. Wintory can explain that to you in his summation, why he does it that way, why he would ask you people to accept as proof beyond a reasonable doubt because of its reliability, his conduct in that respect." (10–5 Tr. 24). Williams stated that "Our mistake, the Slaughters' mistake, Judge Black's mistake was in believing these people would do their job." (10–5 Tr. 58). He also noted the lead prosecutor's demeanor and actions by noting Mr. Wintory spoke with Bonner in "contemptuous terms, tone." He added he wished his memory was as good as Mr. Wintory's "because, if they don't [measure up], they're going to be subjected to his verbal harpoons and his sneers and derisive ridicule." When cross-examining Bonner, Mr. Williams said of Mr. Wintory's demeanor: "[h]ere comes the sneer, the smug derisiveness of counsel," adding that he "can sneer and mock people who don't remember that it was precisely a particular time or somebody said some time maybe months and years earlier because these folks didn't move timely to ask the question to perceive and find the truth." Mr. Williams admitted the attacks were becoming personal when he said "I don't like to inject personality into trials, but when I am representing a man who is charged with first degree murder and facing the prospect of losing his life, I expect, by God, that he's going to get fundamental fairness because that's what we talk about in these courtrooms, a fair trial, and a fair prosecution." (10–5 Tr. 62–64).

Mr. Coyle combined attacks against the prosecution and specific witnesses in describing one of the boys who had seen Appellant near the mur-

In short, as we shall see by other complained-of comments below, closing arguments did neither side honor.[20] We shall assess this error in light of all the evidence presented.

### 3.

¶ 104 Appellant next alleges the prosecutor mistreated Bonner during his cross-examination of her.[21] Appellant complains that the prosecutor improperly used Bonner to bolster other evidence which had come in earlier. A reading of the transcript shows that Bonner was, at best, a very reluctant witness. When she gave answers, she did so grudgingly.[22] Accordingly, the prosecutor

was often forced to repeat information in order to get an answer out of the witness. Under the circumstances of this case, we find no error to this portion of appellant's complaint.

¶ 105 Appellant next complains the prosecutor asked questions for which he knew Bonner would have no answer. Defense counsel objected when the prosecutor began a question with "The ladies and gentlemen of the jury have heard a significant amount of testimony and evidence, physical evidence, about what occurred in this house on that day—." The prosecutor was unable to finish the question. Based on what follows in the record, we find the portion quoted above was

der scene at the time of the murders: "You know, this for him, ladies and gentlemen, was his greatest starring role. Remember, he's Shakespeare in the Park. Imagine the opportunity for him now to be involved in this." He added there was no telling what an investigator had told the boys when they identified Appellant and his car in line-ups. "Do you remember what she told the other witnesses? I wonder that she told these boys whenever she was showing them the photos. Do you think that was a fair-minded lineup? Did you hear her come up and tell you how fair it was? No." (10–4 Tr. 94). He then attacked the other boy who had seen Appellant at the scene. Noting that the witness had earlier said he could not positively identify Appellant at the preliminary hearing, Mr. Coyle noted that "when he comes to court he tells you, our jury, that that's the man he saw three years ago, that JR Slaughter is the man he saw in the car. Two years ago he told use he couldn't be positive. Guess who's been his keeper? Theresa Pfeiffer." (10–4 Tr. 96).

**20.** We would be remiss if we did not compliment the trial judge for his patience and general demeanor during the course of this lengthy trial. He did an admirable job of keeping squabbling, bickering and shouting between opposing counsel to a minimum. The conduct of trial counsel on both sides may not have been beyond reproach, but the court's certainly was.

**21.** Appellant first claims the judge rebuked Mr. Wintory for his actions. It appears the court was making a pointed observation about the prosecutor's conduct. However, taken in context, the prosecutor's actions were not serious. Taken in context, it appears Mr. Wintory was becoming frustrated by the witness's obvious reluctance to answer his questions. At one point the following exchange occurs:

Wintory: "You're surprised by that information. If the defendant—let me ask you this. Did you—"

Court: "No observation, Counsel. She's just trying to understand your question, and you're punching your finger at her and—"
Wintory: "Is the Court objecting to my demeanor towards the witness?"
Court: "Yes, I am. You're just punching your finger at her and yelling like I'm yelling at you—"
Wintory: "And, Judge, this is the same Court—"
Court: "You know I don't mean it personally, but the witness is trying to understand your question. That's the point I'm trying to make."
Wintory: "Judge, I guess the point I want to make is, is that gestures and loud voices have been used by the defense throughout this trial and the Court has defended the right to conduct—and this is the first time on this record that—okay, Judge."
Court: "Go ahead. Go ahead. I'm just—but you're trying to observe the witness. I think the Court's entitled to observe the witness, too. She's just trying to understand, as the Court sees it."

**22.** The following is a representative example: shortly before the exchange complained of in Appellant's brief, the transcript shows an obvious reluctance of the witness to divulge information during cross-examination.
Wintory: [referring to passage on tape re miscarriage] "Well, I mean based on that transcript, obviously, she has had a miscarriage of JR's child, that is a pretty clear indication that they have had sex, don't you think?"
Bonner: "If she did have a miscarriage; I don't know for sure that she did."
Wintory: "But you heard your husband's response when he told her that was important to me too, referring to the miscarriage, right?"
Bonner: "I don't remember if I heard it or not."
Wintory: "I'm sorry. I appreciate that you saw transcripts and you heard. But do you recall seeing a transcript with your husband's response on this topic was that, that, that was important to me too?"
Bonner: "I don't remember that phrase exactly."

merely a preface to questions concerning Appellant's actions toward the victim, information which Bonner may or may not have known. There is no error here. Appellant complains of a second instance of this type of questioning; however, a review of the questions clearly indicates the prosecutor was trying to get the witness to state whether she knew it was important to give authorities accurate information shortly after the murders. This is information which should be within the witness's knowledge, and we find no error.

¶ 106 Nor do we find particularly argumentative questions posed by the prosecutor about whether Appellant could have killed a child. As Appellant's former wife, Bonner would be in a unique position to observe Appellant's attitude toward life in general and children in particular.

¶ 107 Appellant also complains of what he terms a gratuitous remark made by counsel. When discussing interviews Bonner had had with authorities, the prosecutor asked whether she knew they were investigating a homicide. The witness replied she did not know that at first; they first told her they were investigating a crime, then told her the crime was a homicide. In response, the prosecutor said "Okay, Because you didn't mention that on direct. You were told in that very first interview—" and was interrupted by defense counsel's objection. After being told by the court to "stick to questions," the prosecutor continued in a question-and-answer format. During that questioning, the information which constituted the content of the gratuitous remark was elicited from the witness. Accordingly, the jury was apprised of the information in the correct format. Error, if any, was harmless.

¶ 108 The same result is found in Appellant's complaints the prosecutor improperly phrased questions. Even if the questions were improperly phrased at first, the jury received the information as a result of questions of which Appellant does not complain.

¶ 109 Appellant complains the prosecutor was repetitious in his questioning, and criticized the witness for the way she answered questions. This is true. The prosecutor was repetitious in his questioning because the witness was not forthcoming in her answers. We find no error in a prosecutor's trying to elicit information from a hostile witness.

¶ 110 Appellant also accuses the prosecutor of harassing the witness. In the complained-of exchange, the witness had been testifying concerning what she told authorities about telephone calls to the house from other women who may have been upset with Appellant. When asked whether the call occurred within a year before the murder, the witness responded "I believe so, yes." The prosecutor then said: "Well, you're sure about that today." Defense counsel objected, stating the prosecutor was arguing with the witness. The court agreed and sustained the objection. Defense counsel did not request an admonishment. This Court has stated that it is trial counsel's responsibility to request relief when objecting to an inappropriate action. As counsel did not request an admonishment which would have cured the error, we cannot provide relief. *Cheatham v. State*, 900 P.2d 414, 423–24 (Okl.Cr.1995). When a trial court sustains an objection, most error is cured. *Arnold v. State*, 803 P.2d 1145, 1150 (Okl.Cr.1990). This one was.

¶ 111 Appellant also complains because the prosecutor failed to put a time frame in his question and asked vague questions. Appellant fails to mention that in each instance, in response to defense counsel's objections, the question was rephrased to cure the error. Error, if any, could not have harmed Appellant's case.

¶ 112 Appellant also complains the prosecutor asked questions while assuming facts not in evidence. Again, the question was rephrased after objection to clarify and the error was cured; or the witness did not understand the question, and it was rephrased. The same is true of a question Appellant alleges was a misstatement of the facts; a question Appellant alleges served to interject information into the record; and a question Appellant alleges is based on the assumption facts were contained in the record.

¶ 113 Appellant also makes an allegation the prosecutor argued with the trial court or made remarks about defense counsel when

faced with an objection. Appellant lists no specific examples, instead making a blanket reference to page numbers in the transcript. Assuming this constitutes a proper citation to the record, we have examined the pages cited and find that either the jury was ordered to disregard the comments or the prosecutor was trying to respond to the objection. We find no error.

¶114 Appellant specifically lists one exchange he contends shows improper cross-examination of the witness.[23] After reviewing the exchange, we find that, even if the exchange were improper, any error was cured when the witness said she did not understand the question and it was restated.

¶115 On another occasion, the prosecutor accused defense counsel of "making a speech."[24] We do not condone the prosecutor's comment here; nonetheless, it does appear from the record that defense counsel was in fact beginning to make an unwarranted comment about authorities' failing to record an interview they conducted with Bonner. While the prosecutor's remark was error, it was invited error. The impact of this error would have been small. The court immediately corrected the prosecutor and stated defense counsel was merely making a valid objection. This is the equivalent of an admonishment, and cures the error.

¶116 Appellant next claims the prosecutor read from a document not admitted into evidence. Based on the transcript citation provided by Appellant, we are unable to make the same inference as Appellant. We see no factual basis for the allegation here.

¶117 Appellant claims that the total effect of these improprieties exasperated both the judge and the jury. We note that the court did not limit itself solely to the comments of the prosecutor, but to defense counsel as well.[25] This general comment does not show the jury was actually affected by antics of the prosecutor alone, but to both sides. This, in combination with the witness's recalcitrance, clearly exasperated all parties involved in the trial. The effect of this will be examined below, when all the evidence is taken into consideration.

### 4.

¶118 Appellant next claims the prosecutor did not limit his improprieties to Bonner. He claims he also mistreated three other defense witnesses. In the cross-examination of Donna Schley,[26] it came to light that some

---

23. Wintory: "Now, if Jim Slaughter—I'm sorry. If Melody Wuertz had been murdered on an evening when Jim Slaughter was on duty, he had apparently an ironclad alibi, he was on duty with coworkers, right?"
Bonner: "Yes."
Wintory: "If you hadn't been there with Amanda and Alise on a day off, he would have had no alibi, right?"
Williams: "Object to the form of that question, Your Honor."
Court: "Well, if she can answer. She does not have to answer a question she can't answer."
Bonner: "I don't know."
Wintory: "Thank you, Your Honor."
Court: "Overruled. You don't have to say thank you, counsel, just let it be. This is no special privilege outfit, I'm just making a ruling. Answer the question if you can. Can you?"
Bonner: "He'll have to restate it."

24. The following occurred:
Wintory: "Isn't it true, in fact, that you told the investigators on July 3rd none of that—you didn't tell them any of this. You told them that the phone calls—"
Court: "Wait a minute. You asked her—"
Wintory: "Sure. I'm sorry."
Court: "You didn't tell them any of this."

Williams: "Which interview are we talking about?"
Wintory: "The same day I just asked this witness, Judge."
Williams: "There was more than one interview and one was recorded and for reason I don't know—"
Wintory: "Judge, he's making a speech."
Court: "Wait just a minute. He's just stating his objection. Let's identify which interview, the first or second."

25. At one point the court stated: "I want to tell both sides that the jury is getting absolutely sick of this total business. Now, you go ahead and reask your question and simplify the questions. Stop these convoluted questions that take up two or three sentences. Go ahead and ask your question." (9–19 Tr. 88).

26. Schley was an assistant manager of the large discount department store in Topeka, where Appellant claimed he bought his daughter a wristwatch. She testified she pulled copies of cash register tapes as requested by authorities. She was called as a defense witness by the defense in an attempt to show the investigation of Appellant's case was sloppy.

portions of her affidavit did not exactly match her testimony. In so noting, the prosecutor said "Well, taking a look at your words then, your affidavit, and, golly, Mr. Coyle managed to find a couple of things that you're not sure about; is that right?" The question drew an objection as "editorials." The court commented "both sides are guilty of it," then directed the prosecutor to use "[n]o more gollies." While cross-examining Vanessa McNish,[27] the prosecutor asked her that if both Bonner and Appellant had told the grand jury they were all together when they went through her check-out line, "would they be telling the truth?" The question drew an objection. During the cross-examination of Leslie Kissinger,[28] defense counsel objected on different occasions: when the prosecutor asked her if she would be expected to remember "other important details" the evening she and an associate removed various items from the safe; if she knew that her associate had said a list of items removed was in fact prepared, and later asked her "even more plainer" if she knew a list existed; and asked the witness if it was her opinion the associate took guns and knives from the property retrieved from the safe. Again, in many instances the court told the prosecutor to rephrase the question, which he did. Other instances are no more than aggressive cross-examination, which is within the limits tolerated by this Court.

### 5.

¶ 119 Appellant next claims the prosecutor acted improperly during his direct examination of prosecution witnesses. He claims the prosecutor was repetitious during the presentation of testimony, asked leading questions, attempted to allude to inadmissible evidence.

¶ 120 Concerning Appellant's allegations the prosecutor was repetitious, we agree. However, the examples cited by Appellant dealt with testimony by Tom Bevel, a captain in the Oklahoma City Police Department, who is an expert in crime scene reconstructions. Given the nature of the testimony, the repetition, although present, was not error and did not detract from the issues present. It appears the prosecutor attempted to rephrase certain questions to make certain the testimony was given its maximum probative value.

¶ 121 Appellant also complains that the prosecutor attempted to allude to inadmissible evidence. In an *in-camera* hearing before Bevel testified, the judge excluded portions of luminol[29] evidence the prosecution had hoped to present. Feeling that admitting only a portion of that evidence would not be effective, the prosecution elected not to present any of it. Bevel gave his theory of the order in which the murders occurred, and testified it appeared the paralyzed Melody was dragged from the hallway into her bedroom, where she was killed. During examination of Bevel, the prosecutor attempted to clarify a point by saying: "Now, so when we say the evidence upon which you based your—" but was interrupted by the court before he could go any further. After a brief bench conference, the judge said he was not saying the prosecutor had done anything wrong, but he just wanted to be careful. Given that no inadmissible evidence was presented to the jury, we find no error.

¶ 122 Appellant also complains that the prosecutor asked repetitive questions of FBI

27. McNish was a cashier at the main check-out line of the large discount department store in Topeka. She had told authorities she recalled Nicki Bonner and the two daughters coming through her line, but distinctly remembered there was no man with them. In closing argument, Mr. Coyle told the jurors he called the witness so they could judge her demeanor and determine her truthfulness.

28. Kissinger, an attorney and distant cousin of Bonner, testified as to things removed from the safe in the Slaughter's Guthrie house after Appellant's arrest.

29. Testimony during an *in camera* hearing showed luminol is a chemical which is capable of detecting minute traces of blood. When sprayed on an item in dim light, the luminol glows if blood is present. This Court has held evidence of luminol testing is admissible. *Robedeaux v. State*, 866 P.2d 417, 425 (Okl.Cr.1993), *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). Consequently, although admissible evidence, the trial court did not allow evidence of luminol testing of Appellant's car. Error, if any, in not admitting such evidence was to Appellant's benefit.

Agent Gomez. However, an objection was sustained, and no repetitive answers were given. We find no error here.

¶ 123 The prosecutor also asked one witness who had worked with Cecilia Johnson whether the witness thought Johnson was capable of killing the baby Jessica. No answer was given after the objection was sustained. Consequently, we find no error.

### 6.

¶ 124 Appellant lists other examples of what he considers improprieties. He first complains that the prosecutor, in his first closing argument, made an improper reference to a witness's exercising her right to remain silent. During the first closing argument, Mr. Lane stated that "of course Nicki Slaughter didn't volunteer that information either on July 6th when she met Edmond police officers at Edmond." This Court has distinguished the right of a defendant to remain silent from the assertion of that right as applied to a third person. *Jones v. State,* 723 P.2d 984, 985–86 (Okl.Cr. 1986) (citing *Sands v. State,* 542 P.2d 209 (Okl.Cr.1975); *Glover v. State,* 531 P.2d 689 (Okl.Cr.1975); *Walker v. State,* 556 P.2d 1317 (Okl.Cr.1976); *Black v. State,* 664 P.2d 1054 (Okl.Cr.1983)). In so doing, we have noted that "the right to remain silent is a personal privilege which does not vicariously extend to the pretrial silence of third persons." *Id.* Accordingly, we find no error here.

¶ 125 He next claims the prosecutor erred in telling the jury he had other evidence which could have been presented.[30]

We agree this is error. *Omalza v. State,* 911 P.2d 286, 309 (Okl.Cr.1995). However, it is invited error. Below, this Court will assess the probable effect the prosecutor's response had on the jury's ability to judge the evidence fairly, taking in context both the remark and defense counsel's conduct.

¶ 126 Appellant also refers to the end of Mr. Wintory's argument, where he urged the jury to "stand up and say, you may have thought you could have gotten away with this, but you're wrong. You're guilty. You're guilty. Let the record reflect he's grinning and he's shaking his head, but he's guilty." (10–5 Tr. 169). There was no contemporaneous objection to this comment; therefore, it is waived for all but plain, reversible error. There is no error in the first portion of the statement quoted. When taken in context the prosecutor was not telling the jury he thought Appellant was guilty; rather, he was responding to a comment made by defense counsel in closing argument.[31] The same cannot be said for the last sentence, where he asked the record to reflect Appellant was grinning and shaking his head, "but he's guilty." Here, error occurred. We cannot interpret this as asking the jury to find Appellant guilty. *See Omalza,* 911 P.2d at 309. The effect of this error, and whether it is plain and reversible, will be discussed below.

### 7.

¶ 127 Appellant next claims the prosecutor made improper remarks concerning Appellant's burden of proof. While questioning

**30.** Specifically, Mr. Wintory said:
Or do you want to hear all of it? And you all said—you didn't know what you were saying—you said, oh, yeah, we want to hear it all. Bring it on. And we didn't—we still didn't give you—you know, you got all the evidence that is admissible and proper for the Court—that the Court determined—
(10–5 Tr. 159). After the court overruled the motion for a mistrial, the prosecutor proceeded to another subject.

**31.** The prosecutor noted that defense counsel Williams had asked the jurors to put themselves in the position of someone who had a loved one on trial. The prosecutor noted that was all right, but added:
I hope you won't think it unfair for me to ask you to take just the opposite and put yourself in the position of someone who's a family member that wants to see justice done. If we wanted to avoid all the stuff they're talking about, gosh, just turn anybody loose no matter what the evidence, but there is more to it than that. So if you're going to do what he did, I ask you to do this for me. Put yourself in a position of somebody who wants to see justice done, justice done in this case, somebody to stand up like I'm going to ask each and every one of you all to do, at least to yourself, stand up and say, you may have thought you could have gotten away with this, but you're wrong. You're guilty. You're guilty. Let the record reflect he's grinning and he's shaking his head, but he's guilty.

Capt. Bevel, Mr. Wintory asked if it would have been possible to obtain independent testing of some of the evidence.[32] Defense counsel objected, claiming the question implied a defendant had the burden to prove something. We need not decide whether the question constituted an inference as to a defendant's burden of proof here, because even if it were, we have held comment on a defendant's access to evidence is permissible. *See Mitchell v. State*, 884 P.2d 1186, 1201–02 (Okl.Cr.1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995) (comments during closing argument that defendant could have subpoenaed his own blood spatter experts). We find no error here. During recross-examination of the same witness, defense counsel asked "how—under the Constitution of the United States how I'm going to test these two blood droplets," at which time the prosecutor interjected "We concede he cannot. We concede—" (8–31 Tr. 136). The court told the prosecutor he was out of order and admonished the jury to disregard the outburst. Under these circumstances, we find any error would not have had any effect upon the jury. First, the prosecutor conceded a point being made by defense counsel; therefore, Appellant cannot show prejudice on an issue which clearly benefits him. Second, the court admonished the jury to disregard the outburst, thus curing any error which may have occurred. *Smith v. State*, 932 P.2d 521, 531–32 (Okl.Cr.1996), *cert. denied*, — U.S. —, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997); *Gregg v. State*, 844 P.2d 867, 881 (Okl.Cr.1992); *Keeling v. State*, 810 P.2d 1298, 1303 (Okl.Cr.1991).[33]

## B.

¶ 128  In his nineteenth proposition, Appellant alleges that improper remarks in the second stage of the trial mandate his sentence be modified or remanded for a new sentencing proceeding.

¶ 129  He first alleges the prosecutor tried to convince the jury they were part of the law enforcement chain, when he thanked the jury on behalf of the investigating officers, himself, "dozens and dozens of both civilian and law enforcement folks that have been involved in this case for several years." Without holding whether the comment was error, we find the court sustained defense counsel's objection and admonished the jury to disregard the comment, thereby curing any error which may have occurred. *Smith*, 932 P.2d at 531–32; *Gregg*, 844 P.2d at 881; *Keeling*, 810 P.2d at 1303.

¶ 130  Appellant next accuses the prosecutor of equating the "planning" of the murders to an aggravating circumstance. In light of the entire exchange, we find no error. Mr. Lane told the jury that "if you find the aggravating circumstances, the planning to kill Melody and Jessica Wuertz, outweighs the mitigating—" and was interrupted by an objection that "planning to kill" was not an aggravating circumstance (10–6 & 7 Tr. 110). In response, the prosecutor said "Creating a risk of death. If I haven't made it clear—" He was interrupted by the court, who told him to "use the language." We find no error, especially in light of the fact Appellant fails to make an argument showing how the remark prejudiced him.

¶ 131  Appellant next assigns as error the following comment:

> The testimony of the Defendant's other daughters, they're not the ones who face punishment for what they did. You must appreciate, I know, the horrible irony of their testimony. He finds yet more females to poke out front to use to spare him consequences of his conduct. The mitigating circumstances you see, if it doesn't make your blood run cold, he has three

---

32. Specifically, he asked: "Are these still available if any party with subpoena power guaranteed by the Constitution wanted to obtain independent testing for the kinds of things that Mr. Coyle was asking you about to be done, the kinds of tests—" (8–31 Tr. 127).

33. At oral argument, Mr. Coyle also complained of statements made in closing argument by Mr. Lane, who made references to the occult and made references to "screams" of a high priest and drinking blood. These comments are waived for appellate review, as they were not included as examples of prosecutorial misconduct in his brief-in-chief. *See* Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals*, 22 O.S. Supp.1996, Ch.18, App.

daughters who care for him very much, who love him very much. Right. He had four, all of whom could have cared for him. He was remorseless. He was without mercy. He is without remorse now. At my closing argument the smirk, the cold-blooded, you poor pitiful fool look he gave me, he is without mercy.

Defense counsel objected. The court, without either sustaining or overruling the objection, stated "it's argument and the jury is the one who are supposed to evaluate. It comes close, counsel. Let's go ahead." (10–6 & 7 Tr. 123–24). Appellant claims the reference to the "use" of his daughters is improper, but gives no reasons for nor cites authority to support his statement. Clearly, any defendant is entitled to present family members to present mitigating evidence. However, evidence at trial tended to show Appellant used females to his advantage. Consequently, the "use" comment could be interpreted as a comment on the evidence.

¶ 132   The comment concerning the look on Appellant's face during closing arguments is another matter. The State cites *Smith v. State*, 727 P.2d 1366, 1373–74 (Okl.Cr.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) in support of its contention a defendant's lack of remorse is a proper subject for comment during closing argument. In *Smith*, however, the defendant took the stand and testified, thereby allowing the judge and jury to observe him as part of the evidence he was presenting. *Id.* at 1374. Such is not the case here, where Appellant did not testify. Likewise, in *Roberts v. State*, 868 P.2d 712, 722 (Okl.Cr.1994), *cert. denied*, 513 U.S. 855, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994), the jury was observing the appellant during a videotaped interview properly admitted into evidence. Appellant, too, was interviewed and the interview videotaped; however, his demeanor at that time was not what prompted the comment by the prosecutor here. Under these circumstances, a subjective observation by the prosecutor as to something not in evidence was error.[34] The effect of this error will be addressed below.

¶ 133   For his final complaint in this proposition, Appellant contends the following comments were error:

You can do nothing, nothing to bring them back. True. You can do nothing to ease the pain that his conduct inflicted on the other members of his family. There are nieces and nephews that belong to Wes Wuertz that are going to grow up, though. There are lives that are going to be lived out by these folks. There are people you've never met. You saw some of them from the VA. There are people you've never met and never will meet to whom Melody and Jessica's lives have meant something and would have meant something more. The conduct goes outward like the ripples in a stream, as does an act of mercy, so does an act in a stream, as does an act of justice, because that's one thing you can give Wes Wuertz' children when they want to show that happened to their Aunt Melody and their Cousin Jessica. You can give them justice. You can give them justice. Because while you are not entitled to pick up vengeance, you can pick up justice. You can pick up justice and you have the power to wield it. You cannot take back—you cannot give back to these people that portion of their lives which he cut from them as surely as he cut Melody's life from her and shot Jessica's life from her, but you can tell them that while—

(10–6 & & Tr. 124–25). Defense counsel objected to the comments as "an improper argument of what to tell them." We shall address that portion which was preserved by the objection below.

¶ 134   There is no error as to that portion. Before the prosecutor could advise the jury what to "tell" anyone, his remarks were cut off and he did not complete the thought. There is therefore nothing which went to the jury.

¶ 135   The remainder of the comments are therefore addressed only insofar as they

---

**34.**  It must be said that at the end of his closing argument in the first stage, Mr. Wintory did make a comment: "Let the record reflect he's grinning and he's shaking his head, but he's guilty." However, he did not ask the trial court to make the observation a part of the record, and the trial court did not do so.

would be plain, reversible error. We find none here. Taken in context, the comments fairly reflect evidence which was presented by the prosecution during the penalty phase of the trial.

## VI.

### *HARMLESS ERROR ANALYSIS*

¶ 136 Appellant contends in his first proposition of error that there can be no harmless error in this case.

### A.

¶ 137 There is no blanket rule dealing with whether trial errors can be harmless. This Court in *Bartell v. State*, 881 P.2d 92, 98–99 (Okl.Cr.1994), held that a structural error of constitutional dimensions affects the framework within which the trial proceeds, while trial error is an error in the trial process itself. As such, a trial error—constitutional or otherwise—is subject to harmless-error analysis. In our analysis of this case, we have found no structural constitutional errors. Accordingly, any error found is subject to a harmless error analysis. We shall therefore examine the errors in this trial and compare them against the evidence presented, being mindful that "the weaker the evidence against a defendant, the less likely the error is to be harmless." *Simpson v. State*, 876 P.2d 690, 698 (Okl.Cr.1994).

### B.

¶ 138 In the first stage, we found these errors: (1) the court erred in allowing the state to present irrelevant evidence concerning debts of Nicki Bonner; and (2) the following instances of prosecutorial misconduct: (a) the prosecutor accused the main defense witness of committing perjury; (b) the prosecutor accused defense counsel of "making a speech"; (c) the prosecutor erred in telling the jury he had other evidence which could have been presented; (d) he commented during closing argument: "Let the record reflect he's grinning and he's shaking his head, but he's guilty." In the second stage, we found error in closing argument when the prosecutor commented con-

cerning the look on Appellant's face during closing arguments.

### C.

¶ 139 Appellant bases his argument on the fact that, but for these errors, the jury would have believed his alibi defense and found him not guilty. We shall examine that evidence, and compare it with the prosecution's evidence against him.

#### 1.

¶ 140 As noted above, Nicki Bonner testified that the family awoke on July 2. All four were in Appellant's car, a blue-gray Dodge Shadow. They first went to a local restaurant for a late breakfast at approximately noon. The waitress at the restaurant did testify at trial. She did recall Nicki Bonner, as she resembled the mother of a friend. She also stated a man was with Bonner and the girls; however, she was unable to identify Appellant as that man. Furthermore, when shown the same photographic lineup from which the boys in Edmond identified Appellant, she was unable to pick out Appellant as the man who was present in her restaurant that day. Additionally, she stated Bonner ordered for all present at the table; Appellant in his statement to authorities said each person ordered his or her own meal. She also did not recall the man sitting with the family as having a receding hairline; Appellant has a receding hairline.

¶ 141 Bonner testified that following the meal, the family drove to a nearby lake. No evidence was presented to contradict this.

¶ 142 She testified the family then drove to nearby Topeka. Their first stop in Topeka was at Hyper–Mart, a large discount department store. When they got there, Bonner went to one department, while Appellant and his daughters went to another. They reunited approximately 30 minutes after arriving. When they did so, Amanda showed Bonner a watch Appellant had purchased for her at the jewelry counter. They had other items they wanted to purchase, so they went through the main check-out register. A receipt from that register shows a check-out time of 4:16 p.m.

¶ 143 The saleswoman at the jewelry recalled that Appellant purchased a watch for his daughter; however, she was unable to recall the date.[35] There was no receipt for the purchase.[36] The checker at the main register testified she recalled seeing Bonner and two girls come through her checkout line. She did not see a man with them. She would have remembered seeing a man had one accompanied the woman and the girls.

¶ 144 Bonner testified that after leaving the discount store, they drove to a nearby station where they filled the car with gasoline. From there, the family went to a mall, where they arrived at approximately 4:30. She testified they first went to Dillard's. There, Appellant bought a T-shirt. The receipt for that purchase shows it was made at 5:14 p.m. From there, the family went to various stores, then attended a motion picture. After the motion picture was over, they returned to Ft. Riley. Bonner testified they arrived back at the base at approximately 10:30 p.m.

¶ 145 Amanda Bonner, Appellant's older daughter, testified the family went to the Hyper–Mart in Topeka, where Appellant bought her a watch. She put the watch on right after it was purchased. She did not recall the date; but remembered that the next morning when she awakened, her father was gone; and she, her sister and their mother were taken to another building, where her mother disappeared for a while. Photographs were taken on July 5, and the family attempted to dress as they had been on July 2. In that photograph, Amanda was not wearing a watch.

¶ 146 Both parties entered into a stipulation that the distance between the quarters at Ft. Riley to the Wuertz home in Edmond is 282.7 miles; it takes four (4) hours, twenty-three (23) minutes to drive that route. The distance from the Wuertz home to Dillard's in Topeka is 283 miles; it takes four (4) hours, twenty-four (24) minutes to drive that distance. The distance from Dillard's to Appellant's quarters at Ft. Riley is 64.5 miles; it takes one (1) hour, four (4) minutes to drive it. All driving times were conservative estimates at lawful speed limits.

2.

¶ 147 The prosecution's evidence showed that the victims were murdered at approximately noon on July 2, 1991. Two boys walking to the downtown area passed a car which was sitting approximately one block from the Wuertz residence at approximately 12:30 p.m. One of the boys, Jeremy Caviness, wandered a short distance from the others. When he did so, he walked close to the car. As he passed the car, he noticed someone was in it. Caviness was startled, as he did not expect anyone to be in the car. The man in the car also looked startled and looked at Caviness, giving him a "what-are-you-doing-get-away-from-me" kind of look. The man had been bent forward in the car seat and appeared to be fidgeting with something; Caviness recalled it was almost as if the man were reading a book, except his shoulders were moving. Caviness identified Appellant in a photograph lineup as the man he saw in the car. The car was a grayish color with some blue in it. Caviness did not know what kind of car it was; however, he

---

**35.** Bonner and the children arrived at Ft. Riley on June 30. They stayed in Appellant's quarters while they were there. Bonner and Elise drove back to the Slaughter residence in Guthrie on July 6, to allow authorities to search the premises. Amanda stayed in Ft. Riley with Appellant. Bonner returned to Ft. Riley the next day. The next few days, various family members attempted to retrace their steps to secure witnesses. Appellant was processed out of the Ft. Riley facility, and the whole family returned to Oklahoma on July 11.

**36.** Authorities had returned to the store much later and attempted to obtain the tape for that register. They were partially successful. The store used a UPC scanning system to register sales; however, owing to problems sales clerks had experienced with the scanning device at that time, it was not uncommon for the sales clerk to punch in a partial UPC number, along with the price, amount tendered, and change given. This partial UPC number might identify the product, but would not provide any specific information. Such a receipt was found indicating the sale of a Timex watch on July 2 at 3:26 p.m. The clerk was unable to testify this purchase was the one Appellant made; the best she could do was to testify the transaction shown on the store tape was consistent with the sale she made to Appellant. That tape from the store was not produced at trial; it had been lost.

identified Appellant's car in a photographic lineup as the car he saw.

¶ 148 A second boy, Aaron Murphy, was with Caviness that day. He saw Caviness approach the car, and saw a man in the car look up, as if startled. The man had been leaning forward in the seat. The man's actions appeared to startle Caviness as well. Murphy, too, identified Appellant as the man he saw in the car. Although he had initially described the car as a Nissan, Murphy also identified Appellant's car as the car he saw. He specifically recalled it because the car, like Appellant's, had a beaded seat cover on the driver's side.

¶ 149 While in jail pending trial, Appellant told an inmate, Donald Stoltz, one of the boys had identified his car as a Nissan, but it was a Dodge; he implied this weakened the prosecution's case against him. Appellant also said only one of the boys got a good look at him; and if he had had his window rolled up, that boy wouldn't have been able to recognize him, as the windows were slightly tinted. When the inmate asked Appellant why the waitress at the restaurant could not identify him, Appellant replied "It was obviously another guy."

¶ 150 Another inmate, Dennis Hull, testified Appellant stayed after a Bible study and was upset. Appellant said "God forgive me for what I did." When Hull asked Appellant why he did it, Appellant said a "demon told me to do it." Appellant explained that Melody was threatening to ruin his marriage, was pressuring him for more money, and was threatening to tell his wife about everything. He said he had given her $2,000 for a down payment on the Edmond house, and had given her new appliances; but she was pressuring him for more money. Appellant also told Hull he had shot the victims with either a .22 or a .25 caliber (Hull could not remember which); and that he had shot Melody in the spinal cord to paralyze her.

¶ 151 A third inmate, Lloyd Hunter, testified that after one prayer meeting in the jail, he noticed Appellant looked depressed. Hunter told Appellant there was nothing he had done that could not be forgiven, to which Appellant replied, "even murder?" They talked some more, and Appellant said he could not understand why the State was putting him through this, there was no worse punishment than what he was undergoing, having to live every day with what he had done. Appellant said shooting the baby was the worst thing for him to handle. However, Appellant also said he did not feel he could be convicted for the crime because the caliber of the weapon was untraceable.

¶ 152 When Melody's body was found, there were symbols carved in her flesh. The prosecution introduced evidence tending to show the symbols were crude equivalents of symbols found in occult books taken from Appellant. Appellant had discussed witchcraft with co-workers. He told one co-worker that a break-up with a former lover had been difficult for him to accept. He also mentioned that he did not want to become re-involved with witchcraft, but he was finding it difficult to resist its lure. While stationed at Ft. Riley, Appellant had tattoos made. When asked by a friend what their significance was, he said they were symbols of Satan and the brotherhood. He later said they gave him power. Appellant also collected knives. Evidence showed he ordered two knives after Father's Day 1991. One knife in particular—which authorities could not find anywhere after the murders—had dimensions which exactly matched the dimensions of stab wounds found in Melody's body.

¶ 153 At the murder scene, authorities found various pieces of evidence which tended to point to an African–American, including Negroid hairs. The hairs were later determined to have come from a patient who was in the VA hospital in the ward where Cecilia Johnson worked while Appellant was at Ft. Riley. Cecilia Johnson mailed a package to Appellant a short time before the murders were committed. The package was received, and was placed in Appellant's quarters. Furthermore, when asked in the July 3 interviews if he had any idea who could have committed the murders, Appellant suggested it was a black man; no such subject had been broached by authorities before Appellant mentioned it.

¶ 154 Also at the scene authorities found a single hair which had been cosmetically

treated so much it was not immediately recognized as being human. The hair was later determined to be consistent with head hair of a woman who was working with Appellant at Ft. Riley. The woman admitted she had applied so many different treatments to her hair that it was badly damaged and brittle. The woman did not know Melody or Jessica, and had never been to Oklahoma. She had, however, worked with Appellant the night before the murders. The two worked on the same ward, and both used the same common areas, including the same restroom. Based on this evidence, Appellant was the only person who could have been the transfer agent for that hair between Ft. Riley and the Wuertz home in Edmond.

¶ 155 Appellant told a co-worker while he was still at the VA hospital that he was irritated by Melody's attempts to get more money from him after Jessica was born. He said he had undergone a divorce years earlier, and had lost nearly everything. He implied he was not prepared to go through such a procedure again. He said if Melody pressured him he could "take out a contract" on her. The witness understood this to mean he would have her killed. Appellant told one co-worker that he had enjoyed his military service in Vietnam, that he had enjoyed killing and mutilation using a knife, which he said was "better than sex."

¶ 156 Firearm slugs were recovered at the scene. Testing revealed the slugs to be .22 caliber long-rifle bullets. After testing and comparison, firearms experts determined the bullets used were made by Eley, a British manufacturer. The bullets were somewhat specialized, as they were subsonic bullets (did not break the sound barrier when fired, and were therefore quieter). At the time surrounding the murders, that particular brand of bullets was not sold in Oklahoma; they would be a special order. In 1990, 5,500 boxes of Eley subsonic ammunition were imported into the United States. This accounted for 0.0125% of all the ammunition sold in the United States that year. In 1991, Eley dropped its shipment into the United States to 5,100 boxes. That accounted for 0.0116% of the ammunition sold in the country in 1991. In 1990, Eley sold to five companies, each of which imported only once that year (earliest in April and latest in November 1990). In 1991, there were five shipments to four vendors (one imported twice) between February and December 1991. Eley manufactures other bullets besides .22 caliber, but its production will vary depending upon demand. Production at the small company usually consists of between 200,000 and 300,000 bullets at a time. The total production of subsonic .22 caliber bullets was approximately 6½ million rounds per year, of which approximately 275,000 were exported to the United States. When Appellant's gun safe was searched on July 6, 1991, authorities found several boxes of .22 caliber ammunition. Included in that ammunition was a box of Eley subsonic hollow point .22 caliber long-rifle bullets. The box contained 13 rounds of ammunition.

¶ 157 Eley buys lead in blocks from a lead manufacturer. The lead is melted down during the manufacturing process. Lead is ordered at different times during the year, depending on what is necessary for a particular production batch. Due to the fact that the lead itself is mined and processed at different times, it will contain different amounts of trace impurities. These impurities can differ from shipment to shipment, so long as they are within acceptable limits imposed by the manufacturer. A test for the percentage and amount of trace elements was conducted of the slugs found, and samples taken from the Eley ammunition found in Appellant's gun safe were also analyzed. The FBI agent who conducted the test testified that all pieces tested were so close on composition that he could not distinguish among those samples. He said all had the same trace amounts of copper, antimony, bismuth and silver and lack of arsenic. Therefore, all samples were consistent with coming out of the same larger original piece. They had no differences, so that's where they could have originated. He testified that if the bullets had been manufactured at different times, he would not expect composition to be the same. He added that if the bullets analyzed were made at different times in different batches, he would expect to see a measurable quantitative difference in the amounts of trace elements analyzed.

¶ 158 A former military policeman at Ft. Riley testified that on the night of July 2, 1991, he was requested to go to the parking lot which serviced the quarters in which Appellant was staying. He was asked to look for a vehicle with Oklahoma license plates. He and a colleague conducted a search of the lot between 11 p.m. and midnight. At that time, the only such vehicle was the car belonging to Nicki Bonner. There were no other cars in the parking lot with Oklahoma tags. The two men were called away at approximately midnight to investigate another matter. They returned at approximately 2 a.m. to watch the car. The next morning, they discovered Appellant's car in the parking lot. They had not conducted another search of the parking lot when they returned at approximately 2 a.m., because they did not think any activity had transpired in the lot. While Bonner's car had a great deal of trash in it, Appellant's car appeared very clean inside.

### 3.a.

¶ 159 From this, it appears that, although Appellant had a strong alibi after 5 p.m., he had no such alibi before that time. At the restaurant, the waitress specifically recalled Nicki Bonner. She also recalled seeing a man, but she could not identify Appellant as the man she saw. At Hyper–Mart, the jewelry clerk recalled Appellant's buying a little girl a watch, but could not recall the date of the purchase. No receipt specifically identifying the purchase of the particular watch Amanda had could be found. Furthermore, the checkout clerk at the main register specifically recalled seeing Bonner and her daughters, but also specifically recalled there was no man with them.

¶ 160 In light of the strategic flaws in Appellant's alibi defense, and the relatively strong circumstantial evidence set forth above, we have determined that the error listed above complaining of the introduction of improper evidence against Nicki Bonner could not have affected the outcome of the trial. The same is true of the improper comments which were not invited error. Concerning the improper conduct by the prosecutor in the form of invited error, we find the evidence above, when combined with the conduct of defense counsel which invited the errors, could not have affected the outcome of the trial. We further find that the cumulative effect of these errors would not have changed the outcome of the trial.

### b.

¶ 161 Also harmless is the second stage error, when the prosecutor commented that the look on Appellant's face during his closing argument showed him to be a cold-blooded person. There was other evidence tending to show Appellant exhibited no emotion at the death of the victims. One witness testified that, in response to Appellant's complaint the police were focused on him during the investigation, she said the police could not ignore the deaths, as a baby had been killed. This prompted Appellant to respond "well, there were thousands of babies killed in Vietnam, and it was no big deal. All of a sudden this one baby is a big deal." (7–26 Tr. 89–90). Another witness commented that Appellant talked without emotion about babies being cut up in Vietnam. He told another witness he got his power from killing babies. Another witness testified that when she expressed condolences to Appellant on the deaths, he just kind of smiled and expressed no emotion. She testified he seemed more concerned about retaliation by the Wuertz family than the deaths.

¶ 162 Additionally, Appellant told at least one witness after Johnson's first (failed) attempt to commit suicide that his comment "might sound vicious to you, but I wish she had completed the job." He said if she had succeeded, she might have taken the focus off of him.

¶ 163 Based on this other evidence showing Appellant appeared cold-blooded and dispassionate, we see no reversible error in the prosecutor's comment during closing argument.

¶ 164 Accordingly, Appellant's first and twenty-third propositions of error are without merit.

## VII.

### *MANDATORY SENTENCE REVIEW*

¶ 165 This Court is required by 21 O.S.1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. In the murder of Melody Wuertz, the jury found (1) the murder was especially heinous, atrocious, or cruel; and (2) the defendant knowingly created a great risk of death to more than one person. In the murder of Jessica Wuertz, the jury found the defendant created a great risk of death to more than one person. The trial judge in his report also listed the following non-statutory aggravating circumstances: the murders were committed while Melody Wuertz was attempting to obtain child support for Jessica; the murders were planned and premeditated; the defendant murdered his own daughter by shooting her twice in the brain; the defendant mutilated and carved a symbol on his former girlfriend. The jury was instructed on the following mitigating circumstances: he had three daughters who care for him; he had a long career as a nurse and served his patients competently; he served in the military; he was a Vietnam vet; he was model prisoner while in the county jail; he had no prior felony convictions; he had no history of prior violent acts; he had skills and talents which would be utilized for benefit of inmate population.[37]

¶ 166 We find that these statutory aggravating circumstances, coupled with all the evidence from both stages of trial, sufficiently outweigh the mitigating evidence presented by Appellant at trial. We examined the errors contained in the trial above, and find the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

## VIII.

### *CONCLUSION*

¶ 167 Accordingly, the judgments and sentences of the district court are **AFFIRMED.**

CHAPEL, P.J., STRUBHAR, V.P.J., and LANE, J., concur in results.

JOHNSON, J., recuse.

CHAPEL, Presiding Judge, concurs in result:

¶ 1 I agree that Slaughter's convictions and sentences of death should be affirmed. I write separately to briefly address three points. First, while I agree that the Oklahoma death penalty statutes are constitutional, I do not join in the majority's rationale therefor as stated in this opinion. Second, the opinion devotes almost thirty pages to a discussion of prosecutorial misconduct. I believe this opinion is too long, and this is among the sections that could be cut. This was a hard-fought case with outstanding attorneys on both sides. On occasion each side may have crossed the line but, reviewing all the allegations, I find there is no reversible error.

¶ 2 Finally, I disagree with the majority's decision that some hearsay testimony of Cynthia Johnson was admissible as an excited utterance. I believe her telephone conversation with the OSBI was appropriately admitted as an excited utterance, but that her subsequent conversation with her friend was not made while Johnson was under the stress of excitement. However, the evidence was relevant and otherwise admissible, and Johnson was certainly unavailable as a witness. After reviewing the record, I believe these statements were admissible under 12 O.S. 1991, § 2804(B).

¶ 3 I am authorized to state that Judge Lane joins in this vote.

---

**37.** Although it is not a mitigating factor, we also note that the jury was instructed they could use relevant first-stage instructions in the second stage, but each "may, in your discretion, consider sympathy as a factor in your deliberations and then determine whether or not you should give any weight to such factor under all the evidence you have heard in both the first and second stages." (IX O.R. 1655).